IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DERRICK GRAY,

                            Plaintiff,              Civil Action No.
                                                    9:14-CV-1505 (TJM/DEP)

        v.

DAVID E. HARDER, *et al.*,

                            Defendants.

_____

<u>APPEARANCES</u>:                              <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

DERRICK GRAY, *Pro Se*
No. 15-A-0873
Franklin Correctional Facility
P.O. Box 10
Malone, NY 12953

<u>FOR DEFENDANTS</u>:

HON. ROBERT G. BEHNKE                          LEIA D. SCHMIDT, ESQ.
Broome County Attorney                         Assistant County Attorney
Broome County Office Building
P.O. Box 1766
60 Hawley Street
Binghamton, NY 13902


DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Derrick Gray, who is currently a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983, alleging that, while he was held as a pretrial detainee at the Broome County Correctional Facility ("BCCF"), certain corrections officers deprived him of his civil rights. Generally, plaintiff's complaint, as amended, alleges that upon arrival at BCCF where he was to be incarcerated for a misdemeanor offense, he was forced to submit to a strip search in violation of his Fourteenth Amendment rights.

Currently pending before the court is a motion by the only named defendant in this action, the Broome County Sheriff, for summary judgment seeking dismissal of plaintiff's amended complaint based on, *inter alia*, Gray's failure to identify the Doe defendants against whom the remaining causes of action are asserted. Based upon the record now before the court, I recommend that defendant's motion be granted, and that plaintiff's amended complaint be dismissed.

## I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the DOCCS at Franklin Correctional Facility located in Malone, New York. Dkt. No. 42. At all times relevant to his complaint, as amended, he was a pretrial detainee at the BCCF as a result of an arrest for a class A misdemeanor charge of fourth-degree criminal mischief, in violation of New York Penal Law § 145.00.[2] Dkt. No. 7 at 2-3.

According to plaintiff, upon his arrival at the facility, he was "forced to submit to a strip[] search in a secluded shower room area by [defendant] Intake Officer John Doe who order[ed] Plaintiff to remove all his clothing so that [the officer] could. . . inspect[]. . .[the clothing and] plaintiff's mouth, hair,

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). That record includes statements from plaintiff's local rule 7.1 response to defendant's statement of material facts, which the court will treat as an affidavit in light of the fact that the document is notarized and is not a proper rule 7.1 response. *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001). Where plaintiff has failed to provide any evidence refuting statements contained in defendant's statement of material facts, the court will deem such facts admitted for purposes of the pending motion. *See* N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."); *see also Ketchuck v. Boyer*, No. 10-CV-0870, 2011 WL 5080404, at *2 (N.D.N.Y. Oct. 25, 2011) (McAvoy, J.) ("The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly." (listing cases)).

[2]    Plaintiff has annexed various exhibits to his amended complaint, including his criminal history, which the court considers as part of the complaint. Dkt. No. 7-1; *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.").

ears, armpits, knees and toes." Dkt. No. 7 at 3. After removing his clothes, plaintiff was instructed to "bend over backwards [and] squat and cough three times to ensure . . . he was not hiding any contraband." *Id.* Plaintiff thereafter spoke to defendant Sergeant John Doe, who "told plaintiff that the strip[] search was not against his constitutional right[s] and that it was County Correctional Jail[']s policies to strip[] search every inmate at their facility." *Id.* Defendant Sergeant John Doe instructed plaintiff to "grieve it [b]ecause if plaintiff had refused to the Intake Officers strip[] search, he would be escorted to the SHU keeplock box" and issued "a ticket with a surcharge of $25.00." *Id.*

Plaintiff claims to have filed a grievance regarding this incident. Dkt. No. 7 at 3-4, Dkt. No. 36 at 4. Defendant David Harder, the Broome County Sheriff, however, contends that plaintiff never filed a proper grievance in accordance with the facility policies set forth in the handbook that was provided to plaintiff at the time of booking. Dkt. No. 34-7 at 8.

Plaintiff alleges that, "[a]s a result of the deliberate indifference[] exercised by the defendants, [he] suffered from extreme emotional distress[]" and seeks recovery of compensatory damages. Dkt. No. 7 at 4-5.

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff filed his complaint in this action on December 12, 2014, against several defendants, including (1) County Jails/DOCCS, (2) Otsego County Sheriff Richard J. Devlin; (3) John Doe Warden of Otis Bantum Corrections Center; (4) Broome County Sheriff David E. Harder; and (4) Chemung County Sheriff Christopher Wilson Moss. Dkt. No. 1 at 1-2. On January 21, 2015, Senior District Judge Thomas J. McAvoy issued a decision, pursuant to 28 U.S.C. §§ 1915(e), 1915A, granting plaintiff's request to proceed *in forma pauperis* and *sua sponte* dismissing plaintiff's claims against County Jails/DOCCS, with prejudice, and the remaining claims with leave to file an amended complaint. *See generally* Dkt. No. 5.

On February 26, 2015, plaintiff filed an amended complaint against defendants (1) Sheriff David E. Harder, (2) Correctional Officer John Doe of Broome County Correctional Facility ("Intake Officer John Doe"), (3) Sergeant John Doe of Broome County Correctional Facility ("Sergeant John Doe"), and (4) Acting Grievance Officer John Doe of Broome County Correctional Facility ("Acting Grievance Officer John Doe"). Dkt. No. 7 at 1-2. On April 16, 2015, Judge McAvoy accepted the amended complaint and supporting exhibits as the operative pleading but dismissed the claims stemming from allegations of verbal threats and failure to respond to a grievance. Dkt. No. 8. Judge McAvoy's order also dismissed plaintiff's

claims against defendants Moss, Delvin, John Doe Warden of Otis Bantum Corrections Center, and Acting Grievance Officer John Doe. *Id.* As a result, the only claim remaining in this action is related to the strip search conducted by defendants Intake Officer John Doe and Sergeant John Doe, allegedly in violation of plaintiff's Fourteenth Amendment rights. *Id.*

At the present time, defendant Harder remains a defendant in the case, at least nominally. In his initial order, Judge McAvoy determined that plaintiff's amended complaint included no facts plausibly suggesting the personal involvement of defendant Harder for purposes of any of the section 1983 claims asserted against him. *Id.* at 7. Defendant Harder was not dismissed from the action at that early juncture, however, only so that plaintiff could proceed with the action against the remaining Doe defendants. *See id.* at 8 ("Giving due deference to plaintiff's status as an incarcerated pro se litigant and recognizing that the Court has an obligation to assist in identifying unknown defendants, Harder will remain as a defendant in this lawsuit until plaintiff has been afforded an opportunity to conduct discovery to identify the 'John Doe' defendants.").

On January 22, 2016, following the close of discovery, defendant Harder moved for summary judgment dismissing plaintiff's amended complaint. Dkt. No. 34. In their motion, defendant argues that (1) defendant Harder was not personally involved in the conduct giving rise to plaintiff's

claims, (2) plaintiff's claims are subject to dismissal based upon his failure to exhaust available administrative remedies before filing suit, (3) plaintiff's remaining strip search claim lacks merit, and (4) the Doe defendants are entitled to qualified immunity from suit. That motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b)*.*

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

B.     Failure to Identify Doe Defendants

Despite the court's assistance by permitting temporary inclusion of defendant Harder as a named defendant despite the absence of any actionable claims against him, plaintiff has been unable to identify defendants Intake Officer John Doe and Sergeant John Doe. Defendant Harder now seeks dismissal of plaintiff's amended complaint based upon his failure to identify and serve those defendants. Dkt. No. 34-7 at 6-8.

When this action was filed, Rule 4(m) of the Federal Rules of Civil Procedure authorized "the court – on motion or on its own after notice to the plaintiff" – to dismiss a plaintiff's claims against a defendant where a summons and complaint were not served upon that party within 120 days

8

after filing of the complaint, absent a showing of good cause.[3] Fed. R. Civ.

P. 4(m); *see also Shuster v. Nassau Cnty.*, No. 96-CV-3635, 1999 WL 9847,

at *1 (S.D.N.Y. Jan. 11, 1999) ("Rule 4(m) authorizes a court upon a motion

to dismiss an action without prejudice as against a defendant if service of

the summons and complaint is not made upon that defendant within 120

days after the filing of the complaint.");[4] *Romand v. Zimmerman,* 881 F.

Supp. 806, 809 (N.D.N.Y. 1995) (McAvoy, J.) ("[T]he 120-day filing

requirement applies to pro se plaintiffs as well as those represented by

counsel."). This is because when "Doe" defendants have not been served

or otherwise appeared in the action within this time period, the court does

not acquire jurisdiction over them. *See, e.g., Michelson v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989)

(citing *Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 444-45 (1946)).

Upon a showing of good cause, the time for service must be

extended. *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th

Cir. 1996). "If, however, good cause does not exist, the court may, in its

discretion, either dismiss the action without prejudice or direct that service

---

[3]     Effective on December 1, 2015, Rule 4(m) was amended to require service of a summons within ninety days. It should be noted, moreover, that the period specified in Rule 4(m) is further restricted by the local rules of this court, which require that service be effectuated within sixty days. N.D.N.Y. L.R. 4.1(b).

[4]     All unreported cases have been appended to this report for the convenience of the *pro se* plaintiff.

be effected within a specified time." *Panaras*, 94 F.3d at 340 (citing Fed. R. Civ. P. 4(m)); *see also Zapata v. City of N.Y.*, 502 F.3d 192, 196 (2d Cir. 2007) ("We hold that district courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *Zapata*, 502 F.3d at 197.

In this instance, plaintiff was permitted to pursue a claim against defendants Intake Officer John Doe and Sergeant John Doe provided that he "take reasonable steps to ascertain [the] identity" of them. Dkt. No. 8 at 8. In the order permitting the case to proceed, Judge McAvoy explicitly warned plaintiff that "[i]f [he] fails to ascertain the identity of any Doe defendant so as to permit the timely service of process, this action will be dismissed as against that individual." *Id.* Following that order, discovery, which is now closed, took place over a period of several months. *See* Dkt. No. 15 at 5. During that time, plaintiff was unable to identify either of the individuals allegedly responsible for the strip search. Dkt. No. 36 at 4-5. Plaintiff has clearly been on notice that he has failed to serve and join the Doe defendants because, in response to defendant Harder's motion, plaintiff

submitted an affidavit in which he "affirm[ed] that he cannot identify the Defendant's [sic] by names at this present time, due to their names not being made available to him." *Id.* There is nothing in the record now before the court, however, that suggests defendant Harder is responsible for plaintiff's failure to name and join the Doe defendants or that defendant Harder otherwise rendered the Doe defendants' identities unavailable to plaintiff during discovery. Indeed, although plaintiff has submitted certain filings with the court related to discovery, none of them included an allegation that the identities of the Doe defendants were improperly withheld by the named defendant. Dkt. Nos. 22, 30, 33. Although plaintiff contends that "he can at [a] later time identify [the defendants] if giv[en] the opportunity," he does not explain how the identities were not "made available to him" during discovery or why he did not ascertain the identities prior to the close of discovery. Dkt. No. 36 at 5. Because dismissal of a claim is appropriate "[w]here discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so, I recommend that defendant Harder's motion to dismiss plaintiff's claims against the Doe defendants be granted on this basis. *Delrosario v. City of N.Y.*, No. 07-CV-2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010); *accord, Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547 at *21, (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and*

*recommendation by* Dancks, M.J.).

IV.    SUMMARY AND RECOMMENDATION

The remaining claims in this case are asserted against two unidentified individuals.[5] Notwithstanding the opportunity to discover those individuals' identities through discovery, plaintiff has failed to identify and join the Doe defendants. In the absence of any evidence demonstrating good cause for plaintiff's failure, it is hereby respectfully

RECOMMENDED that defendant Harder's motion for summary judgment (Dkt. No. 34) be GRANTED, and that plaintiff's remaining claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

---

[5]    The court has previously concluded that plaintiff's amended complaint fails to state a cognizable claim against defendant Harder. *See* Dkt. No. 8 at 7.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     August 9, 2016
           Syracuse, New York



Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lawrence SHUSTER, Plaintiff,
v.
NASSAU COUNTY, et al., Defendants.
No. 96 Civ. 3635(JGK).

Jan. 11, 1999.

Lawrence Shuster, Fountain Valley, CA, for the Plaintiff, pro se.

Gina M. Amorini, Mineola, NY, for Nassau County.

Michael Kennedy, Assistant Attorney General, Office of the Attorney General, Division of State Counsel, Litigation Bureau, New York, NY, for Hon. Zelda Jones & NYS Dept. of Motor Vehicles.

*OPINION AND ORDER*

KOELTL, J.

*1 The plaintiff filed this action against various defendants alleging false arrest and malicious prosecution for violations of the New York Vehicle and Traffic Law (VTL). The docket sheet reflects that the complaint was filed on May 15, 1996. Defendants Judge Zelda Jonas, the New York State Department of Motor Vehicles (collectively, the "State defendants"), and Nassau County, who have not answered or moved with respect to the complaint or the amended complaint, have requested that the amended complaint be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure because they have never been properly served with the summons and complaint or amended complaint. The docket sheet in this action does not reflect any service on any defendant. The Court therefore by Order dated February 17, 1998 directed the plaintiff to advise the Court in writing why this action should not be dismissed for failure to serve the summons and complaint on the defendants within 120 days of filing of the complaint. While the plaintiff has responded, it is

clear that he has never properly served any of the defendants.

I.

Rule 4(m) authorizes a court upon motion to dismiss an action without prejudice as against a defendant if service of the summons and complaint is not made upon that defendant within 120 days after the filing of the complaint. This Rule also authorizes courts to dismiss an action sua sponte, provided that the court first gives notice to the plaintiff. *See* Fed.R.Civ.P. 4(m); *see also* Gowan v. Teamsters Union (237), 170 F.R.D. 356, 359-60 (S.D.N.Y.1997) (dismissing action filed by a pro se, in forma pauperis plaintiff pursuant to Rule 4(m)).

Separate rules govern service upon state agencies and upon individuals. Under the Federal Rules of Civil Procedure, "[s]ervice upon a state ... or other governmental organization ... shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state...." Fed.R.Civ.P. 4(j)(2). Service upon an individual is made by delivering a copy of the summons and complaint to the individual personally, by leaving a copy thereof at the individual's dwelling house or usual place of abode with a person of suitable age and discretion residing there, or by delivering a copy to an agent authorized to receive service of process. *See* Fed.R.Civ.P. 4(e)(2). The rule further provides that an individual may also be served in accordance with state law. *See* Fed.R.Civ.P. 4(e)(1).

Under New York law, a state officer sued in an official capacity or a state agency must be served by:

(1) delivering the summons to such officer or to the chief executive officer of such agency or to a person designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

**\*2** N.Y. C.P.L.R. 307(2). Subdivision (1) provides that "personal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state." Hence, "[s]ervice on a state officer may be made either by personal delivery to the officer or by certified mail to the officer. Service on a state agency may be made either by personal delivery to the chief executive officer of the agency (or the chief executive's designee) or by certified mail to the chief executive." N.Y. C.P.L.R. 307(2) supplemental practice commentaries (McKinney 1998).

The New York rules for serving an in-state natural person parallel Fed.R.Civ.P. 4(e)(1), but with additional requirements. Like Rule 4, service may be by personal delivery to the person being served, *see* N.Y. C.P.L.R. 308(1), or to a duly appointed agent for service. *See* N.Y. C.P.L.R. 308(3). Service may also be made by delivering the summons to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served, provided that the summons is also mailed to that person's last known residence or sent by first class mail to that person's actual place of business. *See* N.Y. C.P.L.R. 308(2).

In addition, where service under sections 308(1) and (2) cannot be made with due diligence, service may be effected by nailing the summons to the door of the actual place of business, dwelling place, or usual place of abode of the person to be served, and by mailing the summons to that person at his or her last known residence or by sending the summons by first class mail to that person's actual place of business. *See* N.Y. C.P.L.R. 308(4). Under sections 308(2) and (4), the delivery and mailing must occur within twenty days of each other. *See* N.Y. C.P.L.R. 308(2) & (4).

II.

On May 15, 1996, the plaintiff filed the original complaint in this action. On August 14, 1996, the plaintiff filed an amended complaint. In February 1998, well past the 120-day limit for timely service of process, the State defendants requested dismissal of the action pursuant to Rule 4(m). (*See* Letter from Michael Kennedy dated Feb.

13, 1998). The plaintiff was ordered to advise the Court by March 2, 1998 why the case should not be dismissed on that basis. (*See* Order dated Feb. 17, 1998). The plaintiff filed a response dated February 17, 1998. The plaintiff also filed a response received on August 13, 1998. In August 1998, more than two years after the original complaint was filed and nearly two years after the amended complaint was filed, the State defendants and defendant Nassau County requested dismissal of this action on the grounds that they still had not been served. (*See* Letter from Michael Kennedy dated Aug. 3, 1998; Letter from Gina Amorini dated Aug. 3, 1998).

(A)

The plaintiff does not argue that he complied with Rule 4 by delivering the summons and complaint to the chief executive officer of the DMV. Nor does he allege that he delivered the summons and complaint to Judge Jonas, who is sued in her personal and official capacities, personally or to a person of suitable age and discretion at Judge Jonas' dwelling place or usual place of abode. Nor has there been compliance with N.Y. C.P.L.R. 307(2) with respect to either the DMV or Judge Jonas. With respect to the DMV, there has been neither personal delivery to the chief executive officer of the DMV or the chief executive's designee or by certified mail to the chief executive with personal service on an assistant attorney-general or the attorney-general. The plaintiff also has not complied with similar provisions with respect to Judge Jonas.

**\*3** Instead, the plaintiff contends that he had served the State defendants by twice delivering the summons and complaint to the Nassau County Regional Office of the State Attorney General, on July 30, 1996 and February 6, 1998. (*See* Return of Service (unsigned), attached to Feb. 17, 1998 Shuster Letter). To support his argument that service on the Nassau office constituted effective service on the State defendants, the plaintiff submitted a copy of a letter from the Office of the Attorney General stating that its Nassau office would accept service on behalf of, among others, Judge Zelda Jonas in a different action. In addition, he argues that the complaint was also attached to the Order to Show Cause which was served on the Nassau office. (*See* Order to Show Cause attached to Feb. 17, 1998 Shuster Letter). The plaintiff also argues that under New York State law, service on the Attorney General's Office is sufficient.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

Under New York law, delivering the summons and complaint to a regional office of the State Attorney General does not by itself constitute effective service on a state agency or an individual officer sued in her official capacity. *See Berkowitz v. New York City Bd. of Educ.,* 921 F.Supp. 963, 968 (S.D.N.Y.1996); *Dawkins v. Hudacs,* 159 F.R.D. 9, 10 (N.D.N.Y.1994); *Town of Clarkstown v. Howe,* 206 A.D.2d 377, 614 N.Y.S.2d 327, 328 (2d Dep't 1994); *Sannella v. Regan,* 111 A.D.2d 964, 490 N.Y.S.2d 61 (3d Dep't 1985). Moreover, there is no evidence that the Nassau office was authorized to accept service on behalf of the DMV. As to Judge Jonas, the fact that the Nassau office had been designated to receive service on her behalf in another case does not authorize that office to accept service for her in this case.

The plaintiff also contends that he served the State defendants by handing their attorney a copy of the complaint in this Court on or about July 30, 1996. Even if proven, this is also not sufficient under the Federal Rules and New York law unless the attorney is authorized by appointment or by law to receive service of process. *See United States v. Ziegler Bolt and Parts Co.,* 883 F.Supp. 740, 749 (Ct. Int'l Trade 1995); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1289 (S.D.N.Y.1989); *Gibbs v. Hawaiian Eugenia Corp.,* 581 F.Supp. 1269, 1271 (S.D.N.Y.1984). The plaintiff has neither alleged nor provided proof that the State defendants intended to be bound by the acceptance of the complaint by their attorney. While the authority of an attorney to accept service may be implied from the surrounding circumstances indicating the intent of the client, *J & L Parking Corp., Inc. v. United States,* 834 F.Supp. 99, 102 (S.D.N.Y.1993); *Olympus Corp. v. Dealer Sales and Serv., Inc.,* 107 F.R.D. 300, 305 (S.D.N.Y.1985), there is no evidence in this case to establish such intent. The State defendants never acted in any way to indicate that the attorney was authorized to accept service of process. The State defendants never answered the Complaint or filed a responsive pleading, and specifically asserted in correspondence that there had been no service of process. Indeed, the State defendants notified the plaintiff at least as early as February 1998 that service was insufficient. (*See* Feb. 13, 1998 Kennedy Letter).

**\*4** Although the plaintiff is acting *pro se,* his failure to comply with basic procedural rules cannot be excused, particularly in light of the fact that he is familiar with litigation. He has already filed numerous other lawsuits and numerous motions. *See, e .g., Shuster v. Eiberson,* No. CV-92-1524 (E.D.N.Y. Apr. 23, 1993); *Shuster v. Fenster,* No. 92 Civ. 2323; *Shuster v. Citibank,* No. 93 Civ. 4182, 1994 WL 267550 (S.D.N.Y. June 15, 1994); *Shuster v. Prudential Securities Inc.,* No. 91 Civ. 0991, 1991 WL 102500 (S.D.N.Y. June 6, 1991); *Shuster v. Olem,* 96 Civ.1993, 1997 WL 167046 (S.D.N.Y. Apr. 8, 1997); *Shuster v. Eiberson,* No. 97 Civ.1988, slip. op. (S.D.N.Y. Aug. 12, 1997); *Shuster v. Oppleman,* No. 96 Civ. 1689 (S.D.N.Y. filed Mar. 7, 1996); *Shuster v. Voel,* No. 96 Civ. 8240 (S.D.N.Y. filed Nov. 1, 1996). Accordingly, the State defendants' request for dismissal without prejudice pursuant to Rule 4(m) is granted.

(B)

The docket sheet also does not reflect service of process on defendant Nassau County. Fed.R.Civ.P. 4(1) requires proof of service in the form of an affidavit by the server. *See* Fed.R.Civ.P. 4(1). While it is true that, by its terms, the failure to comply with Fed. R. Civ. 4(1) does not affect the validity of the service, the plaintiff has submitted no proof of timely service for any of the defendants. Nor has the plaintiff explained how he purportedly served Nassau County pursuant to federal or state law. The plaintiff has offered no explanation for his failure to serve in response to the Court's directive or to Nassau County's letter requesting dismissal. Nor has he requested an extension of the time to serve. Because the plaintiff was given notice that the case would be dismissed absent a showing of good cause for the failure to serve the defendants, and failed to make this showing, defendant Nassau County's application for dismissal without prejudice pursuant to Rule 4(m) is also granted. *See, e.g., Urquidez v. Officer Lyon # 7505,* No. 97 Civ. 884, 1997 WL 414158 at \*1 (S.D.N.Y. July 23, 1997).

(C)

Similarly, the docket sheet also does not reflect that any of the remaining defendants named in the amended complaint have been served. They include individual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

defendants D. Dillon, N. Levy, Richard Kramer, "Mr. Rainville," Skip Dwyer, R. Jackson, A. Aducci, and "U.S.A. (Bruce [illegible] )," each of whom is sued in his or her official and personal capacities; the Nassau County Republican Party; and unnamed "clients of Frank Cocozzelli" (collectively, the "remaining defendants"). Although the 120-day limit for service of process has long expired, courts generally consider three factors in determining whether "good cause" exists to warrant an extension of the time for service:

(1) whether the delay in service was "the result of mere inadvertence," or whether there has been a "reasonable effort" to effect service[,] ... (2) prejudice to the defendant[,] ... [and 3] whether or not the plaintiff has moved under Fed.R.Civ.P. 6(b) for an enlargement of time in which to effect service.

**\*5** *Gordon v. Hunt,* 116 F.R.D. 313, 319-21 (S.D.N.Y.1987).

These factors do not support an extension of the time to serve the remaining defendants in this case. The plaintiff was directed by the Court to explain the delay in serving the defendants but failed to do so. The plaintiff has not moved for additional time to serve any of the defendants. Moreover, to permit service at this late date would unfairly prejudice the remaining defendants. *See Gowan,* 170 F.R.D. at 359-60. The delay in proceeding against them has been excessive. Accordingly, pursuant to Rule 4(m), the case against the remaining defendants is dismissed without prejudice.

### III.

The plaintiff has also filed a partially illegible "letter and motion for order" in which he seeks an injunction to stop further court proceedings in Nassau County for alleged violations of section 511 of the New York Vehicle and Traffic Law. He argues that the injunction should be granted because all of his past violations of the Vehicle and Traffic Law have been expunged from his record. The Court has already considered and denied a similar motion by the plaintiff on the grounds that the plaintiff failed to show either irreparable harm or a likelihood of success on the merits. *See Shuster v. Nassau County,* 948 F.Supp. 282 (S.D.N.Y.1996). In the present motion, which consists of

one paragraph, the plaintiff offers no new facts to establish either of these requirements for a preliminary injunction. Therefore, the plaintiff's motion for a preliminary injunction is denied.

### IV.

The plaintiff also moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). This motion is plainly improper because there have been no responsive pleadings because the defendants were never effectively served. The motion is therefore denied.

### V.

The plaintiff also moves for an order directing Nassau County to send to the plaintiff a copy of the transcript of a 1996 proceeding before Judge Eiberson in which Judge Eiberson allegedly dismissed various Vehicle and Traffic Law charges against the plaintiff. To the extent that this is a discovery request, it is denied as moot.

### CONCLUSION

For the reasons explained above, this action is dismissed without prejudice. The plaintiff's motion for a preliminary injunction is denied. The plaintiff's motion for judgment on the pleadings is denied. The plaintiff's motion for an order directing Nassau County to produce a court transcript is denied as moot.

SO ORDERED.

S.D.N.Y.,1999.

Shuster v. Nassau County
Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 882990
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jairo DELROSARIO, Plaintiff,

v.

The CITY OF NEW YORK, et al., Defendants.

No. 07 Civ.2027(RJS).
|
March 4, 2010.

West KeySummary

1      **Civil Rights**

   👉  Criminal Law Enforcement;  Prisons

Neither official in charge of prisoner movement
nor official in charge of security had authority
to make final policy decisions for the city
with respect to the protection or housing of
prisoners at penal institution, as required to
hold the city liable under § 1983 for officials'
alleged unconstitutional acts. Inmate alleged that
officials deliberately ignored a known risk to
his safety from fellow prisoners, who repeatedly
threatened and assaulted inmate for cooperating
with authorities, but the only reference to them
was prosecutor's identification of their respective
roles at institution. No information was given
with respect to what authority each had, what
guidelines and policies they were subject to, and
what oversight was in place. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Robert B. Marcus, Schwartzapfel, Truhowsky, Marcus, P.C.,
Jericho, N.Y., for Plaintiff.

Mark D. Zuckerman, Office of the Corporation Counsel of
the City of New York, New York, N.Y., for Defendants.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

**\*1**  Plaintiff Jario Delrosario brings this action against the
City of New York ("the City"), Manhattan Assistant District
Attorney Susan Lanzatella, and ten John Doe Defendants
pursuant to 42 U.S.C. § 1983 for alleged deprivations of his
civil rights. Now before the Court is Defendants' motion to
dismiss Plaintiff's claims pursuant to Federal Rule of Civil
Procedure 12(b)(6). In the alternative, Defendants move for
summary judgment pursuant to Rule 56(a). For the reasons
set forth below, Defendants' motion for summary judgment
is granted.

I. BACKGROUND

Plaintiffs lawsuit stems from injuries inflicted by other
inmates while he was incarcerated at Riker's Island
Correctional Facility ("Riker's"), located in Bronx County,
New York and part of the New York City Department of
Corrections ("DOC"). Plaintiff alleges that, although he was
repeatedly threatened and assaulted by other inmates for
acting as a cooperating witness, Defendants failed to take
steps necessarv to protect him from further violence. In
addition, Plaintiff alleges that Riker's personnel denied him
medical care after he was assaulted.

A. Facts

1. Plaintiff's Arrest, Attack, and Injury

Plaintiff was arrested on September 1, 2005 and charged
with various crimes under New York state law arising out
of a "sting" operation. (Defs.' 56.1 ¶ 3.) After he was
arrested, Plaintiff was taken to and detained at Riker's. (*Id.*
¶ 4.) Defendant Lanzatella, an assistant district attorney
and chief of the Narcotics Gang Unit of the New York
City Special Narcotics Prosecutor's Office ("SNPO"), was
assigned to prosecute Delrosario and his co-defendants. (*Id.*
¶ 7.) Lanzatella was assisted by the only attorney under her
supervision at that time, Nigel Farinha. (Pl.'s 56.1 ¶ 3; Defs.'
56.1 ¶ 25.)

Within two months of his arrest, Plaintiff became a cooperating witness. (Defs.' 56.1 ¶ 11.) In the course of his cooperation, Plaintiff was removed from Riker's and taken to the SNPO as many as 60 times for interviews with investigators and prosecutors. (Decl. of Robert B. Marcus ("Marcus Deck") Ex. A (Dep. Tr. of Susan Lanzatella ("Lanzatella Dep. Tr.")) at 65:25–66:2.) Throughout his cooperation, Plaintiff was repeatedly threatened by his co-defendants on account of the cooperation that they suspected he was providing to authorities. (Pl.'s 56.1 ¶ 8.) Plaintiff's attorney in the state criminal matter, Barry Weinstein, testified that he repeatedly advised both Lanzatella and Farinha of the threats against Plaintiff. (Pl.'s 56.1 ¶ 9; Marcus Decl. Ex. C (Dep. Tr. of Barry Weinstein ("Weinstein Dep. Tr.")) at 12:21–14:21.) [1]

In January 2006, Plaintiff was assaulted at Riker's. (Pl.'s 56.1 ¶ 10; Weinstein Dep. Tr. at 18:7–12.) Weinstein testified that he quickly contacted either Lanzatella or Farinha and so informed them. (*Id.* at 19:7.) It is unclear whether this attack was connected to Plaintiffs cooperation. Plaintiff testified that he did not know why he was attacked (Delrosario Dep. Tr. at 50:10–11), but he also testified that "the same people on my case" were responsible for the attack (*id.* 48:9). Lanzatella states that she was not aware of any January assault. (Supp. Lanzatella Decl. ¶ 3.)

**\*2** After the January assault, Plaintiff was moved to another Riker's building, which he describes as unit C73. (Delrosario Dep. Tr. at 52:5–7.) Plaintiff continued to be threatened in his new housing unit. (*Id.* at 53:13–56:25.) The record indicates that Plaintiff was again assaulted on March 1, 2006. (Weinstein Dep. Tr. at 15:19–20; Marcus Decl. Ex. E (Report of Arthur Elias).) [2] Weinstein testified that Plaintiff was then brought before Lanzatella on March 3, 2006 for further interviews. (Weinstein Dep. Tr. at 16:l–5.) [3] Weinstein testified that after the March 3, 2006 meeting, Lanzatella or Farinha informed Weinstein that Lanzatella was sending a letter "immediately" or "right away" to have Plaintiff moved from Riker's to another facility. (*Id.* at 17:10–13; 26:20–27:10; 27:17–25.)

Plaintiff testified that on March 8, 2009, fearing further violence, he contacted his attorney and asked to be relocated. (Delrosario Dep. Tr. at 60:4–22.) In response, prison officials prepared him to be moved and transferred him to a holding cell. (*Id.* at 60:15–22.) While awaiting transfer to another facility on March 9, 2006, Plaintiff was assaulted by another inmate and suffered serious facial injuries, including a broken

jaw. (Pl.'s 56.1 ¶ 16.) Plaintiff does not know the identity of his assailant or whether the assault was related to his cooperation. (Delrosario Dep. Tr. at 61:8–62:13.)

What steps, if any, were taken by officials between the March 1 and March 9 assaults remains unclear. During discovery, Defendants produced a letter written by Lanzatella and addressed to either Captain Vasatoro, the captain in charge of prisoner movement at Riker's, or Captain Boden, the captain in charge of security at Riker's. (Lanzatella Dep. Tr. at 102:10–103:3.) [4] The letter bears the date of March 3, 2006 and states:

> I am requesting that the above-named inmate [Delrosario] be moved for security reasons from GMDC [at Riker's] where he is currently being held to BBKC [another DOC facility]. The above-named inmate, who was arrested in an armed robbery conspiracy with ten co-defendants, has been repeatedly assaulted while being held at GMDC in the past few weeks, including most recently when his jaw was broken. The inmate is needed as a witness in an ongoing investigation.

> Thank you for your assistance in this matter and please feel free to call should you have any additional questions. (Zuckerman Decl. Ex. F.) The letter is a copy retrieved from Lanzatella's computer; no originals were found. (*See* Lanzatella Dep. Tr. at 104:16–21.) It also references Plaintiff's broken jaw, which did not occur until March 9, 2006. (Pl.'s 56.1 ¶ 16.) Lanzatella speculates that she first wrote a draft on March 3, 2006, in response to an attack on Plaintiff, but did not send it because she then learned that the attack was unrelated to his cooperation. (Lanzatella Dep. Tr. at 122:24–123:24.) She then edited and sent it after the March 9, 2006 attack. (*Id.*)

**\*3** Weinstein testified, however, that Lanzatella or Farinha informed him that a letter was sent on March 3, 2006, the date appearing in the letter. (Weinstein Dep. Tr. at 17:10–13; 26:20–27:10; 27:17–25.) Further, he testified that Farinha told him that the letter had been sent but was disregarded by officials at the DOC because of animus towards Delrosario. (Weinstein Dep. Tr. at 16:10–17:6.) Farinha denies that he made such statements. (Marcus Decl. Ex. B (Dep. Tr. of Nigel Farinha (Farinha Dep. Tr.)) at 84:4–22.) Because the final version contains information concerning the March 9, 2006 attack, and based on Farinha's representations to Weinstein that it was originally sent on March 3, Plaintiff concludes that the letter was originally sent on March 3 and was edited

and resubmitted on March 15, 2006. This conclusion is partially corroborated by information taken from Lanzatella's computer, which indicates the letter was created March 3, 2006 and modified on March 15, 2006. (Marcus Decl. Ex. F.)

After spending time at Bellevue hospital and recovering from his injuries, Plaintiff was transferred to the Manhattan Detention Center, often referred to as the "Tombs." (Delrosario Dep. Tr. at 66:14–15.) After some of his co-defendants were also sent to the Tombs, Plaintiff was again transferred, this time to the Vernon C. Bain Correctional Center, or the "Boat," another City correctional facility. (*Id.* at 67:1–6.) Finally, Plaintiff was transferred to federal custody.

### 2. Procedures or Practices for Cooperating Witnesses

The DOC policies and procedures allow an "inmate [to] be placed into Close Custody Housing either by his or her own request or pursuant to the Department's determination that such housing is necessary and appropriate." (Decl. of Harry Ahl Ex. C III.C.) Close Custody Housing can be used for inmates' own protection. (*Id.* at II.A.) The procedures specifically require that anytime a staff member has reason to believe that an inmate is in danger, or anytime an inmate so requests, he must be placed in Close Custody Housing until a captain arrives. (*Id.* III.C.2.a.) The policy lays out further procedures for determining when an inmate qualifies for such housing, as well as his right to a hearing and other administrative process. (*Id.*)

Lanzatella's practice was "not to get involved with the protection of cooperating witnesses while they were in custody because NYC Department of Corrections has its own criteria for housing inmates" that the DA's office was not involved with. (Def.'s 56.1 ¶ 12.) Further, any requests or recommendations that her office made were "non-binding and whether NYC Department of Corrections honored it was out of [Lanzatella's] hands." (*Id.* ¶ 13.) She testified that if there was a risk to any witness, however, she would inform the DOC. (*See* Lanzatella Dep. Tr. at 112:8–15.)

### B. Procedural History

Plaintiff filed this lawsuit on March 9, 2007, and it was assigned to the Honorable Kenneth M. Karas, District Judge. On September 4, 2007, the case was reassigned to the docket of the undersigned. Plaintiff filed the Amended Complaint

("AC") on May 20, 2009, after discovery had closed. On July 17, 2009, Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment and submitted their Local Rule 56.1 statement. Plaintiff submitted its opposition and own Rule 56.1 statement on September 8, 2009. The motion became fully submitted on September 17, 2009.

**\*4** The Amended Complaint purports to contain a single claim under [Section 1983]. (AC ¶ 64.) Read more closely, however, the Amended Complaint actually asserts several claims against various Defendants. "Count One" alleges that Defendants acted with "deliberate indifference in failing to transfer Plaintiff to another facility and/or remove him from the general population and/or place him in protective custody." (AC ¶ 68.) It also alleges that "Defendants acted with deliberate indifference in intentionally denying and/or delaying Plaintiff's access to medical care and/or attention." (*Id.* ¶ 69.) Finally, it alleges that the Defendants were "supervisors and/or final decision makers" who acted with deliberate indifference towards Plaintiff in failing to adequately supervise, train, or discipline Defendants, "thereby causing said Defendants in this case to engage in the above-mentioned conduct." (*Id.* ¶¶ 71–72.)

Thus, the AC seeks redress from Defendants for both failing to prevent Plaintiffs injuries and for refusing or delaying medical treatment after the March 9, 2006 attack. Liberally construed, the Amended Complaint seeks to impose municipal liability on the City for DOC's failure to adequately safeguard Plaintiff, DOC's failure to timely treat Plaintiff after the March 9, 2006 attack, and Lanzatella's failure to prevent the March 9, 2006 attack. In addition, the Amended Complaint can be read to set forth a claim against Lanzatella in her individual capacity for failing to prevent the assaults, as well as individual claims against the John Doe Defendants for both injuries.

Because Plaintiff has utterly failed to produce evidence to support many of the allegations in the Amended Complaint, the Court will, for reasons of judicial economy, treat Defendants motion as one for summary judgment.

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y.,* 492 F.3d 89, 96 (2d Cir.2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson,* 411 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.' " *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997)) (alteration in original).

### B. Claims Against John Doe Defendants

**\*5** Plaintiff's claims against the John Doe Defendants must be dismissed for failure to prosecute. Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss these Defendants without prejudice. *See Coward v. Town and Village of Harrison,* 665 F.Supp.2d 281, 300–01 (S.D.N.Y.2009); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005). Therefore, Plaintiff's claims against the John Doe Defendants are dismissed without prejudice.

### C. Municipal Liability for the Acts of Prison Officials

Plaintiff alleges that the City is liable for the DOC's failure to adequately transfer, segregate, or otherwise protect him while he was in custody. (AC ¶¶ 68, 71.) Similarly, Plaintiff seeks to hold the City liable for the DOC's failure to timely treat Plaintiffs injuries after the March 9, 2006 attack. (AC

¶¶ 69, 71.) These allegations attempt to state a claim against New York City for liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Defendants move for summary judgment on this claim, arguing, *inter alia,* that Plaintiff has not identified a causal link between any municipal custom or policy and the alleged constitutional violations. (Defs.' Mem. at 7.) For the reasons stated below, the Court grants Defendants' motion for summary judgment with respect to these claims.

### 1. Applicable Law

"A municipality may be held liable as a 'person' for purposes of Section 1983 when a civil rights violation results from a municipality's policy or custom." *Koulkina v. City of N.Y.,* 559 F.Supp.2d 300, 314 (S.D.N.Y.2008). "A plaintiff making a *Monell* claim against a municipality must establish three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Blazina v. Port Auth.,* No. 06 Civ. 481(KNF), 2008 WL 919671, at \*6 (S.D.N.Y. Apr.1, 2008) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)).

An official policy or custom can be demonstrated in a number of ways. First, such a policy can be shown where the agency "promulgates an official policy," or "a municipal employee with final policymaking authority" undertakes an unconstitutional act. *Warheit v. City of N.Y.,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at \*12 (S.D.RY. Aug. 15, 2006); *accord Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Second, a custom or practice may be demonstrated through behavior that is " 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.' " *Davis v. City of N.Y.,* 228 F.Supp.2d 327, 337 (S.D.N.Y.2002) (quoting *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997)). Third, an official policy can be established by a municipality's failure to adequately train or supervise its agents or employees. *See Amnesty Am.,* 361 F.3d at 127– 28 & 127 n. 8. Finally, a plaintiff can state a *Monell* claim where he or she demonstrates that the municipality failed to discipline employees or agents who violate civil rights because "the persistent failure to discipline [can] give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell.*" *Batista,* 702 F.3d at 397.

2. Analysis

a. Decisions by Final Policymakers

**\*6** Plaintiff alleges that Captains Boden and Vasaturo deliberately ignored Lanzatella's or Farinha's March 3, 2006 letter request to move Plaintiff. The Weinstein deposition provides the chief support for this allegation. (Weinstein Dep. Tr. at 16:10–17:6.) Undoubtedly, such an allegation would be sufficient to state a claim for relief against Boden and Vasaturo individually, if they were defendants in this action. *See Heisler v. Kralik,* 981 F.Supp. 830, 837–38 (S.D.N.Y.1997). Because Boden and Vasaturo are not defendants, however, Plaintiff must succeed in demonstrating that they are municipal policymakers on the subject of protecting inmates. *See Chin v. N.Y. City Nous. Auth.,* 575 F.Supp.2d 554, 561–62 (S.D.N.Y.2008).

Although *Monell* liability may attach for the decisions of final policymakers, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur,* 475 U.S. at 481. Rather, a deliberate choice must be made "from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. Whether or not an official is a "policy-making official" for purposes of imposing *Monell* liability is a question of state law determined by the Court. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Plaintiff bears the burden of showing that Boden and Vasaturo are officials with final policymaking authority. *See Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir.2000).

Plaintiff has failed to demonstrate that either Boden or Vasaturo make final policy decisions for the City with respect to the protection or housing of inmates. The only reference to them in the record is Lanzatella's statement that they were "in charge" of "security" and "prisoner movement," respectively. (Lanzatella Dep. Tr. at 102:14–15, 103:2–3.) Plaintiff did not, however, interview or depose any prison officials, including Boden and Vasaturo, or produce any discovery relating to the role of Boden and Vasaturo at Riker's. Plaintiff has produced no evidence as to what authority each had, what guidelines and policies they were subject to, and what oversight was in place. Accordingly, the Court cannot allow this claim to go forward on a theory that either Captain Vasaturo or Boden had

final policymaking authority. *See, e.g., Cruz v. Liberatore,* 582 F.Supp.2d 508, 521 (S.D.N.Y.2008) (granting summary judgment where plaintiff failed to provide "any documentary evidence or testimony suggesting that" the named official was the defendant municipality's final policymaker); *Springle v. Metro. Transp. Auth.,* No. 06 Civ. 734(GEL), 2008 WL 331362, at \*7 (S.D.N.Y. Feb.1, 2008).

b. Deliberate Indifference to a Widespread Practice

To the extent that Plaintiff argues that the City was aware of similar constitutional violations but failed to do anything to end the practice, Plaintiff has failed to adduce any evidence of widespread constitutional violations by DOC personnel.

**\*7** Plaintiff argues that a lawsuit by another prison inmate in this District, *Shuford v. City of N.Y.,* No. 09 Civ. 945(PKC), as well as a recent article in the *New York Times,* provide ample evidence of a policy or practice of the DOC. (*See* Pl.'s Mem. 6–7; Marcus Decl. Exs. G, H.) Neither of these documents, however, is admissible evidence. [5] Although this Court can take judicial notice of filings in other courts, it can do so only to acknowledge the existence of the lawsuit or filing, not for the truth of matters asserted in those claims. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see also Boyd v. City of Oakland,* 458 F.Supp.2d 1015, 1047–48 (N.D.Cal.2006) (declining to take notice of similar lawsuits to establish policy or practice for purposes of *Monell* claim). Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted. *See Griffin v. City of N.Y.,* 287 F.Supp.2d 392, 395 n. 8 (S.D.N.Y.2003); *McAllister v. N.Y. City Police Dep't,* 49 F.Supp.2d 688, 706 n. 12 (S.D.N.Y.1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom.").

Similarly, Plaintiff's Rule 56.1 statement cites no evidence, admissible or otherwise, that the DOC ever denied Plaintiff medical care at any time during or after March 9, 2006, when Plaintiff alleges that his "requests for medical care and attention were ignored, and [P]laintiff was told by the corrections officers that if he sought medical care or informed anyone of his requests for care he would receive an infraction and/or be placed in solitary confinement." (Pl.'s 56.1 ¶ 20.) Such a single isolated incident, especially one involving only low-level or non-policymaking employees, is insufficient to

support a *Monell* claim. *See Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

c. Failure To Train, Supervise, and Discipline

To succeed on a theory of liability based on either failure-to-train or failure-to-supervise, a plaintiff must make three showings.

> First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation. Next, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees [sic] mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Green v. City of N.Y.,* 465 F.3d 65, 80 (2d Cir.2006) (quotations and citations omitted); *accord Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992).

Additionally, to survive summary judgment on a failure-to-train claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am.,* 361 F.3d at 129; *accord Jenkins v. City of N.Y.,* 478 F.3d 76, 94 (2d Cir.2007); *Amensty Am.,* 361 F.3d at 127 n. 8 ("[A] failure to train claim also requires evidence as to the city's training program and the way in which that program contributed to the violation."). In this case, Plaintiff has failed to conduct any discovery as to the training that prison officials undergo regarding the housing of cooperating witnesses, the provision of medical care or—for that matter—any training at the DOC in general.

**\*8** To succeed on a failure-to-supervise claim, Plaintiff "must establish [Defendant's] deliberate indifference by showing that 'the need for more or better supervision to

protect against constitutional violations was obvious,' " but that the municipality "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct.' " *Amnesty Am.,* 361 F.3d at 127 (quoting *Vann v. City of N.Y.,* 72 F.3d 1040, 1049 (2d Cir.1995)). Plaintiff has failed to adduce any evidence of a causal connection between the supervision received by unnamed prison employees and the alleged failure to transfer or segregate Plaintiff or provide him with medical care on March 9, 2006. In fact, the only evidence in the record about DOC procedure is the DOC Directive entitled Restrictive Housing Due Process and its replacement, Close Custody Housing. (*See* Decl. of Harry Ahl Ex. C.) Neither references how employees are supervised. Accordingly, there is no evidence in the record that could support a claim that the City's supervision over prison employees was insufficient.

Finally, Plaintiff has failed to put forth any evidence that the City or DOC failed to adequately discipline its personnel. The record is completely silent with respect to how the DOC responded to complaints against its personnel.

Because Plaintiff has offered no admissible evidence that will support a *Monell* claim for failure to train, supervise, or discipline, the City is entitled to summary judgment.

D. Municipal Liability for Lanzatella

Plaintiff likewise seeks to hold the City liable for Lanzatella's alleged failure to take steps to ensure his safety. Plaintiff has produced no evidence that the City failed to adequately train, supervise, or discipline Lanzatella. Accordingly, Plaintiff can only succeed if Lanzatella herself is "responsible for establishing final government policy." *Pembaur,* 475 U.S. at 482; *accord Gronowski v. Spencer,* 424 F.3d 285, 298 (citing *Pembaur* ) (2d Cir.2005) ( "Even one episode of [unconstitutional conduct] may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy."). Because Lanzatella is not a final policymaker, however, the City is entitled to summary judgment on this claim as well.

*Section 177–c of the New York Judiciary Law* provides authority for the district attorneys of the counties comprising large New York cities to create a plan for a special narcotics prosecuting unit. *See* N.Y. Judiciary Law § 177–c. The SNPO is one of these units and it was created by agreement among the district attorneys of the five counties that make up New

York City. (*See* Decl. of Kristine Hamann (Hamann Decl.) Ex. E.) The plan calls for the appointment of one Special Assistant District Attorney, who "[u]nder the policy direction of the five District Attorneys" will "formulate policies, procedures and standards for the prosecution of cases" in that unit. (*Id.* at 3.) That Special Assistant District Attorney is Bridget Brennan. (*See* Defs.' 56.1 ¶ 29.) In addition to Brennan, an Executive Staff supervises the different bureaus and units within the SNPO. (*Id.* ¶¶ 30–31.) The Narcotics Gang Unit is one of these subunits. (*Id.*)

**\*9** Lanzatella is an ADA in the SNPO and the chief of the Narcotics Gang Unit. (Defs.' 56.1 ¶ 7.) Her duties are limited to "supervising the lawyers and staff people in the Narcotics Gang Unit, interacting with detectives, going to court and handling cases in court, interviewing witnesses, and motion and grand jury practice ." (*Id.* ¶ 26.) At the time of the events that gave rise to Plaintiff's claim, Lanzatella supervised only one other attorney, Farhina. (*Id.* ¶ 25.)

Based on New York state law and the uncontroverted evidence in the record regarding the structure of the SNPO, Lanzatella cannot be said to have final responsibility for establishing governmental policy with respect to the handling of cooperating witnesses or ensuring inmate safety. *See* *Peterson v. Tomaselli,* 469 F.Supp.2d 146, 169–70 (S.D.N.Y.2007) (concluding that unit chief in same office was not a final policymaker), Plaintiff has adduced no evidence or legal authority indicating otherwise.

Accordingly, the City is entitled to summary judgment on Plaintiff's *Monell* claim for Lanzatella's conduct.

### E. Individual Claims Against Lanzatella

Plaintiff also asserts claims against Lanzatella in her individual capacity. Lanzatella argues that all claims brought against her must be dismissed under the doctrines of absolute or qualified immunity.

### 1. Absolute Immunity

Prosecutors have absolute immunity for claims for damages arising out of duties that "are intimately associated with the judicial phase of the criminal prosecution." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Actions are not, however, immune simply because they are performed by a prosecutor. *See* *Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209. 273 (1993). "[W]hen a prosecutor performs an investigative or administrative function"—functions not accorded immunity at common law—"absolute immunity is not available." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987). To determine whether absolute immunity attaches to particular conduct, courts apply a functional approach. *See* *Cornejo v. Bell,* 592 F.3d 121, 126 (2d Cir.2010) ("The real distinction between whether an executive employee is entitled to absolute or qualified immunity turns on the kind of function the employee is fulfilling in performing the acts complained of."). When asserting absolute immunity, the official claiming the privilege "shoulders the burden of establishing the existence of immunity for the function in question." *Hill v. City of N.Y.,* 45 F.3d 653, 660 (2d Cir.1995).

Prosecutors are entitled to absolute immunity only for "conduct 'intimately associated with the judicial phase of the criminal process,' " *Hill,* 45 F.3d at 661 (quoting *Imbler,* 424 U.S. at 430), including the initiation of prosecutions, the presentation of evidence at trial, preparatory functions such as evaluating and organizing evidence and presenting it to a grand jury, and the decision of which criminal charges to bring, *id.* Put another way, those functions a prosecutor carries out not as an advocate, but as an investigator and administrator, are not accorded absolute immunity. *See* *Buckley,* 509 U.S. at 273–274 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir.1973))).

**\*10** This is not to say that the functional approach draws a bright line between in-the-courtroom and out-of-the-courtroom tasks. As the Supreme Court stated in *Buckley,*

> [w]e have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for

its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273.

The Second Circuit has twice considered what immunities attach to a prosecutor's dealings with a cooperating witness. First, in *Barbera v. Smith,* the estate of a murdered cooperating witness brought suit against an Assistant United States Attorney for negligently disclosing the witness's cooperation and for denying the witness's requests for protection. *See Barbera,* 836 F.2d at 98–99. In rejecting absolute immunity, the court characterized the prosecutor's activity as the "supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in prosecution." *Id.* at 100. The *Barbera* court noted that, at the time the cooperating witness was put at risk and killed, "the government was still seeking evidence, including testimony from witnesses such as Barbera, that would enable it to prosecute" the targets of the investigation. *Id.* at 101. The *Barbera* decision did "not foreclose the possibility in an appropriate case" of absolute immunity for such a claim; it merely concluded that on the facts before the court, the prosecutor's "activities at the time of the alleged conduct ... seem[ed] to have involved primarily" investigative functions. *Id.*

Similarly, in *Ying Jing Gan v. City of New York,* the Second Circuit found that a prosecutor's failure to protect a witness was "not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings." 996 F.2d 522, 531 (2d Cir.1993). Although the investigation was, as in *Barbera,* in its preliminary stages at the time of the witness's death, the Circuit held that the plaintiff complained of "conduct that plainly is not integral to a decision of whether or not to institute a prosecution or the conduct of judicial proceedings," and accordingly found that it was not entitled to the protection of absolute immunity. *Id.*

As in *Barbera* and *Gan,* the record reveals that the primary role of Plaintiff's cooperation was to develop evidence, both for the prosecution of Plaintiff's co-defendants and for new prosecutions. "Lanzatella was debriefing ... Delrosario to determine whether or not he had information about other potential criminal activity. That investigation eventually led to another prosecution." (Farinha Dep. Tr. at 14:5–13.) Although Lanzatella testified that her interviews of Plaintiff were intended "to obtain information about the defendants he was arrested with and their criminal activities

and others," (Lanzatella Dep. Tr. at 71:13–16 (emphasis added)), she also testified that a primary purpose of Plaintiff's cooperation was to "develop additional cases about others and additional crimes" (*id.* 72:17–20). In fact, most of the cooperation sessions that Lanzatella "sat in on had to do with other people that [Delrosario] knew that were involved in criminal activity." (*Id.* 73:3–6.) Similarly, Farinha testified at his deposition that "Lanzatella is primarily responsible for conducting investigations." (Farinha Dep. Tr. at 13:9–13.) Because Lanzatella's primary purpose in signing Delrosario up as a cooperator was investigating criminal activity, both Plaintiff's own and that of others, rather than "a decision with regard to whether or not to institute a prosecution" or the "performance of [her] litigation-related duties," *Gan,* 996 F.2d at 530, her conduct is not shielded by the doctrine of absolute immunity.

### 2. Qualified Immunity

**\*11** " 'The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known.' " *Peterson v. Tomaselli,* No. 02 Civ. 6325(DC), 2003 WL 22213125, at *5 (S.D.N.Y. Sept.29, 2003) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996)). "Even when a plaintiff's federal rights are well-defined, a defendant may successfully claim qualified immunity 'if it was objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)). When an official asserts the privilege of qualified immunity, a Court should uphold that immunity "unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Gan,* 996 F.2d at 531 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

"As a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Gan,* 996 F.2d at 533 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)); *accord Matican v. City of N.Y.,* 524 F.3d 151, 155 (2d Cir.2008). The Supreme Court has, however, recognized two exceptions to this broad principle. First, "the state or its agents may owe a constitutional obligation to the victim of private violence

if the state had a 'special relationship' with the victim." *Matican,* 524 F.3d at 155. "Second, the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim." *Matican,* 524 F.3d at 155 (quotations and citations omitted).

The *DeShaney* line of cases recognizes that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney,* 489 U.S. at 199–200 (citing *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)); *accord Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("The [Eighth] Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). Accordingly, courts have found that liability can be imposed on prison officials where a prisoner faces an objectively serious risk of harm and the prison official acts with deliberate indifference towards the inmate's safety. *See Farmer,* 511 U.S. at 834.

At least with respect to non-custodial cooperating witnesses, however, the Second Circuit has made clear that no special relationship exists such that a prosecutor is responsible for the safety of a witness. *See Gan,* 996 F.2d at 535; *Barbera,* 836 F.2d at 102. This case thus present the question of whether Plaintiffs incarceration imposed upon Lanzatella a "clearly established" duty to take affirmative steps to ensure his safety like the one imposed upon prison officials in *Farmer.* A constitutional right is clearly established where "(1) the law is defined with reasonable clarity (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Reuland v. Hynes,* 460 F.3d 409, 420 (2d Cir.2006) (citation omitted).

**\*12** In this case, Plaintiff has cited no authority, and this Court can find none, that requires prosecutors to step into the shoes of prison officials and safeguard prisoners. *Cf. Newman v. Gonzalez,* 05 Civ. 5215(LB), 2007 WL 674698, \*2 (E.D.N.Y. Mar. 5, 2007) ("[*Barbera* ] held that a prosecutor

was entitled to qualified immunity because there was no clearly established duty to protect the witness at the time of his death. *No right has since been established."* (omissions and internal citations omitted; emphasis added)). While cognizant of the special relationship that exists between prison officials and inmates, *see Morales v. N.Y. State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1998), that relationship has not been extended to reach other state actors.

As recently as 2000, a court in this District addressed a nearly identical set of facts and found that no clearly established legal duty existed. In *Johnson v. City of New York,* the plaintiff sued the City and its officials for failing to protect him from attacks by fellow inmates against whom he had agreed to testify. *See Johnson v. City of N.Y.,* No. 00 Civ. 3626(SHS), 2000 WL 1335865, at \*1 (S.D.N.Y. Sept.15, 2000). Despite allegations that an assistant district attorney had assured the plaintiff that he would be protected from fellow inmates, Judge Stein concluded that "it cannot be said that it was clearly established that [the assistant district attorney] had created or assumed a special relationship with [plaintiff] imbuing him with a constitutional duty to protect him." *Id.* at \*4.

Based on the lack of case law establishing a duty of prosecutors to protect inmates from the violence of other inmates, the Court finds that Lanzataella did not have a clearly established duty to protect Plaintiff. Accordingly, she is protected from these allegations by qualified immunity.

### III. CONCLUSION

For the foregoing reasons, Defendants City of New York and Lanzatella's motion for summary judgment is granted in its entirety, The claims against the John Doe Defendants are dismissed without prejudice. The Clerk of the Court is respectfully directed to terminate the motion docketed as Doc. No. 84, to enter judgment accordingly, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 882990

Footnotes

1   Lanzatella disputes that she was informed of such threats prior to the March 9, 2006 incident. (*See* Defs.' Reply 56.1 ¶ 8.)

2   Defendants object to Weinstein's testimony on this point on hearsay grounds. Defendants object to Elias's report on the grounds that no foundation has been laid for the expert report. Because this evidence does not change the outcome, the Court need not resolve the objection.

3   Defendants also object to this testimony on hearsay grounds because Weinstein was not sure whether or not he was there himself. Because this evidence does not alter the outcome of Defendants' motion, the Court need not resolve the objection.

4   The intended recipient of the letter is unclear. While the inside address contains the name of Captain Vasatoro, the greeting is addressed to Captain Boden. (Decl. of Mark D. Zuckerman (Zuckerman Decl.) Ex. F.)

5   It is true that in considering a deliberate indifference claim, including claims for failure to supervise or discipline, a Court may consider complaints made against a municipality *and its response to them to* determine whether the municipality acted with deliberate indifference. *See Fiacco v. City of Rensselaer,* 783 F.2d 319, 327–28 (2d Cir.1986). Plaintiff, however, simply cites to allegations of misconduct to support the proposition that the conduct occurred, or, in the alternative, cites to the allegations of misconduct without investigating how the City responded. Neither supports an inference of deliberate indifference.

---

**End of Document**                                             © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 791547
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eugene JONES, Plaintiff,

v.

ROCK, Superintendent, Upstate Correctional
Facility; J. Marinelli, MHU Counselor, Upstate
Correctional Facility; John Doe # 3, Mental Health
Doctor, Upstate Correctional Facility; Michael
Hogan, Mental Health Commissioner; J. Healy,
Co., Upstate Correctional Facility; John Doe #
2, Co., Upstate Correctional Facility; John Doe
# 3, Co., Upstate Correctional Facility; Laveen,
C .O., Upstate Correctional Facility; Dwyer, C.O.,
Upstate Correctional Facility; John Doe # 4,
Lt., Upstate Correctional Facility; S. Santamore,
Sgt., Upstate Correctional Facility; Burgess, Co.,
Upstate Correctional Facility; John Doe # 5, Co.,
Upstate Correctional Facility; John Doe # 6, CO.,
Upstate Correctional Facility; Jerry Miller, Dental
Doctor, Upstate Correctional Facility, Defendants.

No. 9:12–cv–0447 (NAM/TWD).
|
Signed Feb. 24, 2015.

**Attorneys and Law Firms**

Eugene Jones, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Colleen Galligan, Esq, Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Therese Wiley
Dancks, duly filed on the 31st day of January 2015.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt.
No. 46) is granted in its entirety.

3. The plaintiff's claims against John Doe defendants # 1–
6 are dismissed without prejudice from this action due to
plaintiffs failure to prosecute.

4. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

### ORDER AND REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

### I. INTRODUCTION

Plaintiff Eugene Jones commenced this *pro se* civil rights
action under 42 U.S.C. § 1983 for the violation of his
Eighth Amendment right to be free from cruel and
unusual punishment while he was confined in the Upstate
Correctional Facility ("Upstate"). (Dkt. No. 1.) Plaintiff
asserted claims in his Complaint for: (1) deliberate
indifference to his serious mental health needs against
Defendants Upstate Superintendent Rock ("Rock"),
Upstate Mental Health Unit ("MHU") Psychologist 2,
J. Marinelli, incorrectly sued as Marienelli ("Marinelli"),
MHU Unit Chief T. Kemp ("Kemp"), Mental Health
Doctor John Doe # 1, and Mental Health Commissioner
Michael Hogan ("Hogan"), *id.* at ¶ 72; (2) excessive
force and deliberate indifference to Plaintiff's serious
mental health and medical needs against Defendants
Corrections Officer Healy ("Healy"), and Corrections
Officers John Doe # 2 and John Doe # 3, *id.* at ¶ 73;
(3) conditions of confinement against Defendant Rock;
*id.* at ¶ 74; (4) sexual harassment, assault, and excessive
force against Defendants Lt. John Doe # 4, Sgt. S.

Santamore ("Santamore"), Corrections Officer Lavigne, incorrectly sued as Laveen ("Lavigne"), and Corrections Officer Dyer, incorrectly sued as Dwyer ("Dyer"), *id.* at ¶ 75; and (5) deliberate indifference to Plaintiff's serious dental needs against Defendants Corrections Officer John Doe # 6, Doctor Jerry Miller ("Dr. Miller" or "Miller").

Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure after filing an Answer to the Complaint. (Dkt. No. 23.) Plaintiff opposed the motion. (Dkt. No. 27.) The Hon. Norman A. Mordue, Senior D.J., adopting the Report and Recommendation of this Court (Dkt. No. 30), granted Defendants motion in part and denied it in part. (Dkt. No. 31.) Dismissed on the motion were: (1) all of Plaintiffs claims seeking money damages against all Defendants in their official capacity with prejudice on Eleventh Amendment grounds; (2) claim for deliberate indifference to Plaintiff's serious mental health needs as against Defendant Hogan only; (3) claim for conditions of confinement against Defendant Rock; (4) claims for sexual harassment, assault and excessive force against Defendants Lavigne, Dyer, and Santamore; and (5) claim for deliberate indifference to Plaintiff's serious dental needs as against Defendants Burgess and Santamore.[1]

**\*2** Defendants Marinelli, Kemp, Healy, Dyer, and Miller have now moved for summary judgment on Plaintiff's remaining Eighth Amendment claims: (1) Count # 1 for deliberate indifference to Plaintiff's serious medical (mental health) needs against Defendants Marinelli and Kemp; (2) Count # 2 for deliberate indifference to Plaintiff's serious medical (mental health) needs and excessive force against Defendant Healy; and (3) Count # 5 for deliberate indifference to Plaintiff's serious medical (dental) needs against Defendants Miller and Dyer. (Dkt.Nos.46, 46–2.)

The grounds for summary judgment asserted by Defendants are: (1) Plaintiff's failure to exhaust administrative remedies as to Counts # 1 and # 2 against Marinelli, Kemp, and Healy; (2) Plaintiff's inability to state a prima facie claim of deliberate indifference with regard to medical (mental health) care against Defendants Kemp or Marinelli and medical (dental) care against Defendants Miller and Dyer; (3) Defendants Kemp and Miller's lack of personal involvement in the alleged violation of Plaintiffs Eighth Amendment rights; and (4)

Defendants Kemp, Marinelli, Dyer, and Miller's right to qualified immunity. (Dkt. No. 46–2 at 2–3.)[2]

Plaintiff has not opposed Defendants' summary judgment motion. For the reasons that follow, the Court recommends that Defendants' motion (Dkt. No. 46) be **GRANTED** in its entirety and further recommends the *sua sponte* dismissal of the action against Defendants John Does # 1–6 for failure to prosecute.

## II. STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under those standards, the party seeking summary judgment bears the initial burden of showing, through the submission of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Ruotolo v.*

*IRS,* 28 F.3d 6, 8 (2d Cir.1994) (district court "should have afforded [*pro se* litigants] special solicitude before granting the ... motion for summary judgment"). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP) JCF, 1999 WL 983876 at *3, U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) [3] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Plaintiff's failure to oppose Defendants' summary judgment motion does not mean that the motion is to be granted automatically. An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." [4] *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (citations and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.' ") (quoting *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001)).

Recently, in *Jackson v. Federal Exp.,* 766 F.3d 189, 198 (2d Cir.2014), the Second Circuit made clear that "[i]n the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." In doing so, "the court may rely on other evidence in the record, even if uncited." *Id.* at 194 (citing Fed.R.Civ.P. 56(c)(3)). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted). [5]

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). [6] For this reason, courts in this district have routinely enforced L.R. 7.1(a)(3) [7] in cases in which the non-movant

has failed to respond to the movant's Rule 7.1 Statement of Material Facts by deeming the facts to have been admitted where: (1) the facts are supported by evidence in the record; [8] and (2) the nonmovant, if proceeding *pro se,* has been specifically advised of the possible consequences of failing to respond to the motion. [9] *See Champion,* 76 F.3d at 486; *see also Jackson,* 766 F.3d at 194 (a non-movant who fails to respond to a summary judgment motion "runs the risk of unresponded-to-statements of undisputed facts proffered by the movant being deemed admitted.") While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to *pro se* litigants ... does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Literati v. Gravelle,* No. 9:12–CV–00795 (MAD/DEP), 2013 WL 5372872, at *6, 2013 U.S. Dist. LEXIS 137826, at *8 (N.D.N.Y. Sept.24, 2013) (internal citations and punctuation omitted).

**\*4** In light of Plaintiff's failure to oppose Defendants' summary judgment motion, the facts set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46–1) that are, as shown below, supported by record evidence and are uncontroverted by nonconclusory factual allegations in Plaintiffs verified Complaint, are accepted as true. *See McAllister v. Call,* No. 9:10–CV–610, 2014 WL 5475293 (FJS/CFH), at *3, 2014 U.S. Dist. LEXIS 154422, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert properly supported facts set forth in a L.R. 7.1(a)(3) statement of material facts where plaintiff did not oppose defendant's motion for summary judgment); *Douglas v. Perrara,* No. 9:11–CV–1353 (GTS/RFT), 2013 WL 5437617, at *3, 2013 U.S. Dist. LEXIS 14125, at * 6 (N.D.N.Y. Sept.27, 2013) ("Because Plaintiff[, who filed no opposition,] has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a) (3) ..., supplemented by Plaintiff's verified Complaint ..., as true."). As to any facts not contained in Defendants' Statement Pursuant to Rule 7.1, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Literati,* 2013 WL 5372872, at *7 (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003)).

## III. BACKGROUND

### A. Plaintiff's Mental Health Issues

Plaintiff has been incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") since the fall of 1995. (Dkt. Nos. 46–1 at ¶ 1; 47 at ¶ 6.) [10] Because Plaintiff had received psychiatric services while in the Niagara County Jail, he was seen by a psychiatrist when he entered the DOCCS system and placed on the New York State Office of Mental Hygiene ("OMH") service. (Dkt. Nos. 46–1 at ¶ 2; 47 at ¶ 7; 47–1 at 13.) He has received mental health services from OMH off and on since his incarceration. (Dkt. Nos. 46–1 at ¶ 3; 47 at ¶ 8; 47–1 at 12–21.)

During his incarceration, Plaintiff's "Mental Health Level" has fluctuated from Level 1 to Level 6 on a scale of 1 to 6. (Dkt. Nos. 46–1 at ¶ 4; 47 at ¶ 9.) The Treatment Needs Service Level UCR Policy defines Level 1 as the most serious and includes major mental illnesses such as schizophrenia and psychotic disorders requiring active treatment, and not having six months of psychiatric stability; those with documented psychotic or bipolar illness who are on certain drugs; and those with psychiatric hospitalizations within the past three years, significant or repeated suicide attempts and/or self-abuse history within the past three years, or suicide attempts resulting in in-patient hospitalization within the last six months. (Dkt. Nos. 46–1 at ¶ 5; 47 at ¶ 10; 47–1 at 9.)

Level 6 is defined as "Mental health assessment completed does not require mental health services." (Dkt. Nos. 46–1 at ¶ 6; 47–1 at 9.) Although Plaintiff's mental health status improved between 2005 and 2010, in August of 2009, while he was in the Special Housing Unit ("SHU") at Great Meadow Correctional Facility ("Great Meadow"), his mental health level was downgraded to Level 3, defined as "Needs/may need short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders OR suffer from a mental disorder which is currently in remission and can function in a dormitory facility which has part-time Mental Health staff." (Dkt. Nos. 46–1 at ¶ 8; 47–1 at ¶¶ 12–13; 47–1 at 1, 10.) While Plaintiff was confined at Great Meadow, Psychiatrist Kalyana Battau prescribed Topamax for his psychiatric symptoms. (Dkt. Nos. 46–1 at ¶ 9; 47 at ¶ 14; 47–1 at 63.)

*5 Plaintiff was transferred from Great Meadow to Upstate on September 17, 2009, and arrived with a diagnosis of Antisocial Personality Disorder ("ASPD"), and a prescription for Topamax. (Dkt. Nos. 46–1 at ¶ 11; 47 at ¶¶ 15–16; 47–1 at 8, 9, 44.) The Transfer Progress Notes prepared by a Great Meadow's Social Worker state that Plaintiffs mental status was "Alert, oriented. No evidence of thought disorder. Mood generally neutral, stable." (Dkt. Nos. 46–1 at ¶ 11; 47–1 at 44.)

According to Plaintiff, Upstate is a maximum security prison in which seventy-five percent of the inmates are housed in SHU. (Dkt. No. 1 at ¶ 14.) Plaintiff was confined in SHU in a single cell in A–Block in 11–Building where mentally ill inmates were housed together. *Id.* at ¶¶ 15, 26. Defendant Marinelli, employed by OMH as a Psychologist 2 at the Central New York Psychiatric Center ("CNYPC") satellite unit at Upstate, first saw Plaintiff on September 21, 2009. (Dkt. Nos. 1 at ¶ 15; 46–1 at ¶ 12; 48 at ¶ 8; 48–1 at 46–47.) Plaintiff has alleged in his Complaint that he told Marinelli he had a long history of mental illness and treatment both before and during his incarceration. (Dkt. No. 1 at ¶ 16.) Marinelli observed no concerns or issues at that time. (Dkt. Nos. 46–1 at ¶ 12; 48 at ¶ 8; 48–1 at 46–47.) He placed Plaintiff on "active status" so he would continue to receive OMH services. (Dkt. No. 48–1 at 46–47.)

On September 23, 2009, Marinelli prepared a Mental Health Treatment Plan ("Plan") for Plaintiff based upon his mental health history, diagnosis of ASPD, and current mental status. (Dkt. Nos. 46–1 at ¶ 13; 48 at ¶ 9; 48–1 at 23–34.) The Plan included Plaintiff being placed on Marinelli's service so that he would be seen regularly at his cell, monthly call-outs for private mental health interviews, and continuation of his prescribed medication Topamax. *Id.* The Plan was approved by OMH Staff Psychiatrist Bezalel Wurzberger ("Dr.Wurzberger") on October 2, 2009. (Dkt. Nos. 46–1 at ¶ ; 48 at ¶ 12.)

When Marinelli saw Plaintiff for a cell-side visit on September 29, 2009, Plaintiff was doing well and had no current health concerns. (Dkt. Nos. 46–1 at ¶ 14; 48, at ¶ 11; 48–1 at 48.) When he met with Plaintiff for a private therapy session on October 7, 2009, Marinelli observed no active mental illness and Plaintiff had no health complaints. (Dkt. Nos. 46–1 at ¶ 15; 48 at ¶¶ 11; 48–1 at 49.)

Plaintiff saw Dr. Wurzberger for an evaluation on October 9, 2009. (Dkt. Nos. 1 at ¶ 17; 23 at ¶ 14; 46–1 at ¶ 18; 47–1 at 30.) Wurzberger's Psychiatric Progress Note states in part:

**COMPLAINTS/CURRENT ISSUES:**

Inmate recently transferred to this facility; gives a history of "ups and downs and anxiety"; says that he was treated with multiple medications in the past; reports "doing alright now", rates himself "in the middle" on the 0–10 moods scale; sleep and appetite are adequate; has no complaints.

**\*6** The record indicates an extensive history of behavioral problems, characterologically driven, for which he was referred twice to the [Behavioral Health Unit] BHU.

**MENTAL STATUS EXAMINATION AND CHANGES:**

Is alert, oriented, coherent and relevant; mood and affect are appropriate; there are no signs of abnormal psychomotor activity; denies hallucinations; denies self harm thoughts or intent; cognitive functions adequate.

**SUICIDE RISK ASSESSMENT:**

No current warning signs of suicidality.

**PLAN:**

Discussed treatment options, including risks and benefits involved; he is psychiatrically stable, with no objective evidence of a mood disorder or a thought disorder; discussed with him the fact that Topamax has no psychiatric indications, is non-formulary, and is not indicated for his clinical presentation; I suggested a trial of an SSRI for the anxiety symptoms he described; he told me "thank you, but no thank you", and refused to consider other alternatives; we'll monitor for changes and reassess treatment options as needed.

(Dkt. Nos. 46–1 at ¶ 18; 47–1 at 30.) Dr. Wurzberger discontinued Plaintiffs Topamax on October 9, 2009. (Dkt. Nos. 46–1 at ¶ 19; 48 at ¶ 15.) Marinelli and Kemp did not make the decision to discontinue the Topamax. (Dkt. Nos. 46–1 at ¶¶ 43–44; 47 at ¶ 40; 48 at ¶ 48; 48–1 at 64.) According to Kemp, the discontinuance was proper because there is no psychiatric indication for the use of Topamax. (Dkt. Nos. 46–1 at 46; 47 at ¶ 50; 48–1 at 30.)

When Marinelli saw Plaintiff for his weekly cell-side visits on October 13, 2009, October 23, 2009, and November 9, 2009, after discontinuance of the Topamax, Plaintiff denied mental health issues or concerns, and Marinelli observed no evidence of mental illness or ongoing mental health issues or concerns. (Dkt. Nos. 46–1 at ¶¶ 20–22; 48 at ¶¶ 16–18; 48–1 at 50–53.) At a private therapy session with Marinelli on November 13, 2009, Plaintiff discussed efforts to make positive changes in his life, his relationship with his family, and how his early experiences affected how he related to authority figures. (Dkt. Nos. 46–1 at ¶ 23; 48 at ¶ 19; 48–1 at 50.)

The reports from Marinelli's cell-side visits with Plaintiff on November 25, 2009, and December 16 and 31, 2009, and his private mental health interview with Plaintiff on December 15, 2009, all reflect Marinelli's observation that Plaintiff had no current mental health issues. (Dkt. Nos. 46–1 at ¶¶ 24–26; 48 at ¶¶ 20–23; 48–1 at 53–55.) On November 25, 2009, Plaintiff reported he was happy that he had been moved to the PIMS [11] gallery, which was a quieter gallery, and on December 31, 2009, reported that he liked his new "hood." (Dkt. Nos. 46–1 at ¶ 24; 48 at ¶¶ 20 and 23 .) Plaintiff had also told Marinelli he liked his current housing situation at a private mental health interview on December 15, 2009. (Dkt. Nos. 46–1 at ¶ 25; 48 at ¶ 29; 48–1 at 53.)

**\*7** However, in a January 13, 2010, letter to Defendant Kemp, a Licensed Clinical Social Worker employed by the NYS OMH as Unit Chief for the CNYPC mental health unit at Upstate, Plaintiff complained of being taken off the medication he was on when he arrived at Upstate, and that despite really trying, he was having a lot of symptoms of mental illness and couldn't keep living like that. Plaintiff claimed that he tried to talk to Marinelli, "but he thinks it's a game or something." Plaintiff asked Kemp to change his therapist to someone who would treat his mental health issues rather than treating them like a joke. (Dkt. Nos. 1 at ¶ 20; 27–1 at 10.) Plaintiff claims to have received no reply from Kemp, and Defendants have not referenced the letter in their statement of material facts. (Dkt. Nos. 1 at ¶ 20; 46.) According to Plaintiff, every time he wrote to Kemp, Marinelli would appear at his cell door and warn him against writing the complaints and telling him "not to go over his head." (Dkt. No. 1 at ¶ 20.)

On January 25, 2010, Plaintiff refused to attend his private interview with Marinelli, and Marinelli noted that termination of Plaintiff's mental health services should be considered based upon his stability and lack of reported or observed mental health concerns. (Dkt. Nos. 46–1 at ¶ 28; 48 at ¶ 24; 48–1 at 55.) Marinelli thereafter had a cell-side meeting with Plaintiff on January 29, 2010, and noted that no mental health concerns were reported or observed. (Dkt. Nos. 46–1 at ¶ 29; 48 at ¶ 25; 48–1 at 56.) Marinelli and Plaintiff discussed whether mental health treatment should be discontinued, and according to Marinelli, Plaintiff wanted to wait a month before discontinuing services. *Id.* Marinelli had cell-side visits with Plaintiff on February 18, 2010, February 25, 2010, March 16, 2010, and March 30, 2010. (Dkt. Nos. 46–1 at ¶¶ 31–34; 48 at ¶¶ 27–30; 48–1 at 58–61.) According to Marinelli, Plaintiff denied any mental health issues, and Marinelli did not observe any mental health concerns. *Id.*

On March 30, 2010, Marinelli prepared Termination Transfer Notes recommending that Plaintiff be terminated from OMH service and a Treatment Needs/ Service Level Designation recommending that Plaintiff's Mental Health Level be changed to Level 6. (Dkt. Nos. 46–1 at ¶¶ 35–36; 48 at ¶¶ 31–32; 48–1 at 11, 62.) Kemp reviewed the recommendation and Plaintiff's mental health records and approved the change in Mental Health Level and Plaintiff's removal from OMH services. (Dkt. Nos. 46–1 at ¶ 37; 47 at ¶ 42; 47–1 at 11.) Even after Plaintiff's termination from the OMH caseload, he continued to receive regular mental health evaluations by OMH staff every ninety days due to his SHU placement. (Dkt. Nos. 46–1 at ¶ 42; 48 at ¶ 39; 48–1 at 3–6.)

On March 22, 2010, prior to the termination, Plaintiff had written to Kemp, identifying the subject of the letter as "I want to know why you are trying to ruin my life worse than it already is." (Dkt. Nos. 1 at ¶ 22; 27–1 at 9.) In the letter, Plaintiff asked why every time he wrote to Kemp complaining about Marinelli, Marinelli would show up bragging that Kemp had given him a copy of the letter. (Dkt. No. 27–1 at 9.) He asked Kemp why he couldn't help him to see a doctor so he could get some medication to stop the voices in his head and told him that when he talked to Marinelli about seeing a doctor, he laughed in his face. *Id.* Again, according to Plaintiff, he received no reply or visit from Kemp regarding the letter. (Dkt. No. 1 at ¶ 20.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

**\*8** On May 3, 2010, Plaintiff wrote to NYS Commissioner of Mental Health Michael Hogan ("Commissioner Hogan" or "Hogan") explaining that the only reason he was bothering him was that Kemp either wouldn't reply to his letters or would keep sending Marinelli to his cell to harass him about writing to Kemp. (Dkt. Nos. 1 at ¶ 21; 27–1 at 8.) Plaintiff explained to Hogan that he had a long history of mental health problems and taking medication. Plaintiff told Hogan that his medication had been taken away, and he felt himself slipping back into mental illness. Plaintiff also complained of hearing people talking and not knowing if the voices were real or in his head. (Dkt. No. 27–1 at 8.) Hogan did not reply. (Dkt. No. 1 at ¶ 21.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

Marinelli conducted a SHU 90–day mental health examination of Plaintiff on June 3, 2010, which confirmed that his Mental Health Level was 6, and that he did not require mental health services at that time. (Dkt. Nos. 46–1 at ¶ 38; 48 at ¶ 34; 48–1 at 3–4.) On June 17, 2010, Plaintiff wrote a second letter to Kemp informing Kemp that he had written to his boss about the conditions in SHU and the fact that Kemp and Marinelli had refused to treat mentally ill inmates or let them see mental health doctors. (Dkt. Nos. 1 at ¶ 20; 27–1 at 13.) Kemp did not reply. (Dkt. No. 1 at ¶ 20.) The letter is not addressed in Defendants' statement of material facts. (Dkt. No. 46–1.)

Plaintiff claims that on August 30, 2010, he used a piece of metal to cut his arms, and when Plaintiff showed Marinelli, he said "they don't look that bad," and told Plaintiff to run some water on the cuts and he would be fine. (Dkt. No. 1 at ¶ 22.) Plaintiff claims that he started screaming and Marinelli just walked away. *Id.* Plaintiff wrote to Kemp the same day. In the letter, Plaintiff told Kemp that he had attempted suicide by cutting his arms open, and Marinelli laughed when he showed him. (Dkt. Nos. 1 at ¶ 20; 27–1 at 13.) Plaintiff asked Kemp to arrange for him to talk to someone other than Marinelli and informed Kemp that the next time he tried suicide, he would not just cut himself but would hang himself and make no mistakes. *Id.* Kemp did not respond. (Dkt. No. 1 at ¶ 20.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46.) Marinelli denies the incident occurred and claims that if it had, he would not have responded in the manner Plaintiff has alleged.

(Dkt. Nos. 46–1 at ¶ 36; 48 at ¶ 36.) Plaintiff's mental health records, which have been submitted by Defendants, include no reference to the suicide attempt Plaintiff claims to have made. (*See* Dkt. Nos. 47–1 and 48–1.)

On September 10, 2010, Marinelli conducted another SHU 90–day mental health evaluation of Plaintiff, which confirmed that Plaintiff's Mental Health Level remained at Level 6 and did not require any mental health treatment at that time. (Dkt. Nos. 46–1 at ¶ 39; 48 at ¶ 35; 47–1 at 5–6.) On September 21, 2010, Plaintiff wrote a second letter to Hogan. (Dkt. Nos. 1 at ¶ 21; 27–1 at 7.) In the letter, Plaintiff asked Hogan to come visit Upstate to see what was going on and to help him. According to Plaintiff, the inmates on the mental health caseload were off their medications and were screaming, banging, and throwing things. Plaintiff claimed to be unable to sleep, or eat, and told Hogan that when the mental health staff came around, including Marinelli, they just laughed at everyone and didn't try to talk or do anything about the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) There is no reference to the letter in Defendants' statement of material facts. (Dkt. No. 46–1.)

**\*9** Plaintiff wrote to Kemp again on October 14, 2010. (Dkt. Nos. 1 at ¶ 20; 27–1 at 12.) In the letter, Plaintiff told Kemp that he had been reading and found out that Kemp and his friends had been violating the law by not treating people for their mental illnesses, and that he planned to sue him. Plaintiff wrote that he could not understand how people could look at a person like him as the scum of the earth but see Kemp as a good guy that he would never treat people the way Kemp did. (Dkt. No. 27–1 at 12.) Kemp did not reply. (Dkt. No. 1 at ¶ 20.) There is no reference to the letter in Defendants' statement of material facts. (Dkt. No. 46–1.)

On November 8, 2010, Plaintiff sent a formal complaint against Marinelli to Hogan "as outlined in NYCRR § 701.2(A), (C), (E)," and requested that Hogan follow the regular procedure of the Grievance Committee. (Dkt. Nos. 1 at ¶ 21; 27–1 at 5.) In the letter, Plaintiff referenced his previous complaints to Hogan of May 3 and September 21, 2010, and Hogan's failure to take action. (Dkt. No. 27–1 at 5.) The gist of Plaintiff's complaint against Marinelli was that Plaintiff disclosed his long history of mental illness and that the parole board had informed him he needed to take a mental health unit program before he could be released. *Id.* Marinelli said

he had reviewed Plaintiffs file and would help him. *Id.* Instead, Plaintiff was taken off his medication and received no treatment at all. *Id.* Plaintiff described the single cell SHU section where he was housed as being filled with mentally ill inmates who were not being treated by the mental health staff and were banging and screaming all night, cutting themselves, smearing feces, and refusing to eat. *Id.* Plaintiff informed Hogan of the letters he had sent to Kemp with no response, and that Marinelli had done nothing to improve the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) The formal complaint is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

Plaintiff was transferred from Upstate to Clinton Correctional Facility on November 15, 2010. (Dkt. Nos. 46–1 at ¶ 40; 48 at ¶ 37.) At that time, Plaintiff's Mental Health Level was still 6, and he did not require any mental health services. *Id.;* Dkt. No. 48–1 at 1.

## B. Healy [12]

According to Plaintiff, in the early morning of October 21, 2010, he made a rope from his sheets and hanged himself in the shower. (Dkt. No. 1 at ¶ 23.) In his Complaint, Plaintiff alleged that Healy and two other corrections officers entered Plaintiff's cell and cut him down and then began beating him with their hands and feet. *Id.* Plaintiff begged them to stop. *Id.* Healy and the other two officers made Plaintiff promise not to hang himself again and left his cell. *Id.* Healy warned Plaintiff that if he tried writing up the incident he would really wish he were dead. *Id.* Later in the day, Plaintiff cut his wrist and showed Healy, who again did not obtain help for Plaintiff from the mental health or medical staffs. *Id.* at ¶ 24.

## C. Plaintiff's Alleged Lack of Proper and Adequate Dental Care

**\*10** On August 29, 2010, while eating breakfast, one of Plaintiffs teeth cracked and lost its filling, which left Plaintiff in pain and unable to eat on one side of his mouth. (Dkt. No. 1 at ¶ 48.) Plaintiff claims that he thereafter submitted a number of sick call slips to the dental department requesting assistance and sent letters to Defendant Miller, a dentist at Upstate, asking for help on September 6 and 14, 2010. [13] *Id.* at ¶ 29.

On October 5, 2010, Plaintiff submitted Grievance No. UST 44009–10, in which he complained that he had been in pain for over a month because of a lost filling and had written to the dental department several times but had not been called out. (Dkt. Nos. 46–1 at ¶ 74; 49–2 at 4.) In his Declaration, Dr. Miller has stated that he investigated the claim and determined that no dental call out slips had been received from Plaintiff during that time period, as Plaintiff has claimed (*see* Dkt. No. 1 at ¶ 49), but made no mention of Plaintiff's September 6 and 14, 2010, letters. [14] (Dkt. Nos. 46–1 at ¶ 75; 49 at ¶ 19.)

Prior to filing the grievance, Plaintiff had gone to a dental appointment on September 29, 2010. (Dkt. Nos. 1 at ¶ 50; 46–1 at ¶ 51; 49 at 3.) When he arrived for the appointment, he learned from the hygienist that he was there for a cleaning, not to treat his lost filling and cracked tooth. (Dkt. No. 1 at ¶ 50.) Plaintiff's dental records confirm his claim that he informed the dental hygienist of the lost filling at the September 29th appointment, and Miller acknowledges that Plaintiff's dental records reflect that he informed the hygienist about the lost filling, and states that Plaintiff was scheduled for a follow-up appointment on November 3, 2010, to address the lost filling concern. (Dkt. Nos. 46–1 at ¶¶ 51, 53–54; 49 at ¶¶ 10–13; 49–1 at 3.) The hygienist's note did not indicate that Plaintiff complained of pain from the lost filling, and Dr. Miller has opined that a lost filling without significant pain is not emergent and does not require immediate dental treatment. (Dkt. Nos. 46–1 at ¶¶ 78–79; 49 at ¶¶ 22–23.)

On November 3, 2010, Dyer and Corrections Officer Burgess escorted Plaintiff from his cell for an Alcohol and Substance Abuse Treatment Program ("ASAT") evaluation and a dental call-out. (Dkt. Nos. 46–1 at ¶¶ 55–56; 51–2 at ¶¶ 6–7.) The ASAT evaluation was to be conducted in the room next to the block dental office. *Id.* Plaintiff claims that he told Dyer he wanted to refuse the ASAT call out because he was really in pain and couldn't eat or sleep and really needed to see the dentist. (Dkt. No. 1 at ¶ 55.) Dyer is alleged to have told Plaintiff that he made the rules, and the rules were that if Plaintiff refused one call out, he refused both. (Dkt. No. 1 at ¶ 56.) Dyer denies that Plaintiff ever told him he was in pain or that he wanted to skip the ASAT evaluation in order to see the dentist sooner. (Dkt. Nos. 46–1 at ¶ 57; 51–2 at ¶ 8.)

**\*11** Plaintiff was placed in a holding pen, and while he was waiting to see the dentist, Dyer escorted him to the ASAT evaluation. (Dkt. Nos. 46–1 at ¶¶ 58–59; 51–2 at ¶ 10.) After the ASAT evaluation, Plaintiff was returned to the holding pen to wait for the dentist. (Dkt. Nos. 46–1 at ¶ 60; 51–2 at ¶ 11.) According to Dyer, while Plaintiff was waiting in the holding pen, he began yelling at the dental escort that he was going to be seen next by the dentist. (Dkt. No. 46–1 at ¶ 61; 51–2 at ¶ 12.) Plaintiff claims that when a corrections officer tried to take Plaintiff to see the dentist, Dyer waived him away and told Plaintiff if he made it into the dentist at all he would be last, and he might not get in there at all. (Dkt. No. 1 at ¶ 57.) Dyer contends that he did not threaten Plaintiff in any way, and the only thing he said to him was "Jones, stop causing a disturbance," when Plaintiff was yelling at the dental escort. (Dkt. Nos. 46–1 at ¶¶ 62–63; 51–2 at ¶ 13.)

According to Dyer, Santamore spoke to the dentist, who said he had priority cases ahead of Plaintiff. (Dkt. Nos. 46–1 at ¶ 64; 51–2 at ¶ 14.) Plaintiff was told to quiet down or he would be returned to his cell, and when he continued to yell and create a disturbance, Santamore ordered Plaintiff returned to his cell. (Dkt. Nos. 46–1 at ¶¶ 65–66; 51–2 at ¶ 16.) Dyer claims he had no interest or intent in interfering with Plaintiff's dental care and was only complying with Santamore's order in taking Plaintiff back to his cell. (Dkt. Nos. 46–1 at ¶¶ 67–68; 51–2 at ¶¶ 17–19.) Dyer does not address Plaintiff's execution of a Refusal of Medical Examination And/Or Treatment with regard to the dental work he was supposed to have done on November 3, 2010, or the notation by Plaintiff "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but corrections staff refuse to let me see dental staff." (Dkt. Nos. 46–1 at ¶ 70; 49–1 at 6.) Plaintiff claims that it was dismissed Defendant Burgess who demanded Plaintiff sign the dental form and go back to his cell or he would be seeing more than the dentist with a visit to the facility hospital. (Dkt. No. 1 at ¶ 59.) According to Dr. Miller, he did not see Plaintiff on November 3, 2010, and was not involved in obtaining the refusal signed by Plaintiff. (Dkt. Nos. 46–1 at ¶ 72; 49 at ¶ 16.)

Plaintiff's tooth was not fixed before he left Upstate, but according to Plaintiff, he was seen by dental approximately a week after being transferred to Clinton and received a temporary filling. (Dkt. No. 1 at ¶ 63.)

## IV. ANALYSIS

### A. Exhaustion of Administrative Remedies with Regard to Claims Against Defendants Healy, Marinelli, and Kemp

Defendants Healy, Marinelli, and Kemp seek summary judgment dismissing Plaintiffs' Eighth Amendment claims against them on the ground that Plaintiff failed to exhaust his administrative remedies. (Dkt. Nos. 46–2 at 4–7; 46–4 at ¶¶ 11–12.) The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, and expressly requires that no action shall be brought with respect to prison conditions under § 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).

### 1. DOCCS Internal Grievance Program

**\*12** In New York State prisons, DOCCS has a well-established three-step Internal Grievance Program ("IGP"). *See* N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, Part 701 (2013); (Dkt. Nos. 46–1 at ¶¶ 82–84; 46–4 at ¶¶ 4–6.) The first step requires an inmate to file a grievance complaint with the facility's IGP clerk within twenty-one days. *Id.* at § 701.5(a). If there is no informal resolution, the Inmate Grievance Resolution Committee ("IGRC") holds a hearing. *Id.* at § 701.5(b)(2). If the grievance is denied by written decision of the IGRC, *id.* at § 701.5(b)(3), the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c) (1). The appeal of a grievance involving an institutional issue is decided by the superintendent of the facility. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Review

Committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i). The third step is an appeal to CORC, *id.* at 701.5(d)(1)(i), which issues a written decision. *Id.* at 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at \*4, 2010 U.S. Dist. LEXIS 32014, at \*16 (N.D.N.Y. Mar.31, 2010); *Bailey v. Fortier,* No. 09–CV–0742 (GLS/DEP), 2012 WL 6935254, at \*6, 2012 U.S. Dist. LEXIS 185178, at \*14–15 (N.D.N.Y. Oct.4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

An exhaustion review does not end when defendants are found to have met the burden of establishing a plaintiff's failure to exhaust. "Once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at \*4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff.

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility." *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at \*5 & n. 26 (collecting cases).

**\*13** Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even

though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified. [15] *Hemphill,* 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

### 2. *Exhaustion as to Healy*

Plaintiff's allegations with respect to his Eighth Amendment deliberate indifference and excessive force claims are set forth in paragraphs 23 and 24 of his Complaint. (Dkt. No. 1 at ¶¶ 23–24.) Plaintiff has alleged in his Complaint that he "used the prisoner grievance procedure available at Upstate on 1/13/10 to exhaust all remedies all remedies were exhausted on 10/14/10 for issues in paragraph # 23 and # 24." (Dkt. No. 1 at ¶ 66.) The dates provided by Plaintiff make no sense given that Plaintiffs claims against Healy arise out of an incident that allegedly occurred on October 21, 2010. *Id.* at ¶¶ 23–24. Furthermore, as discussed below, the documentary evidence in the summary judgment record establishes that Plaintiff never appealed a grievance arising out of that incident to CORC. (Dkt. Nos. 46–1 at ¶ 88; 46–4 at ¶ 12 and 4.)

Jeffrey Hale (Hale"), Assistant Director of the IGP, is the custodian of records maintained by CORC, which renders the final administrative decisions under the DOCCS IGP. (Dkt. No. 46–4 at ¶ 2.) According to Hale, the issues alleged in Plaintiffs Complaint are proper subjects for grievances under the DOCCS IGP. (Dkt. Nos. 46–1 at ¶ 86; 46–4 at ¶¶ 8–9.) DOCCS Directive # 4040 stipulates that when an inmate appeals a grievance to CORC, it is DOCCS' policy to maintain grievance files for the current year and four prior years. (Dkt. Nos. 46–1 at ¶ 85; 46–4 at ¶ 7.) CORC maintains records in accordance with that policy and, in fact, the CORC computer database contains records of all appeals of grievances received from the IGP Supervisor, as well as those reviewed under the expedited procedure at § 701.8, since 1990. *Id.* Hale conducted a diligent search for appeals filed by Plaintiff based on grievances filed at the facility level and has submitted true

and correct copies of records maintained by CORC which show that Plaintiff did not appeal any grievance filed under §§ 701.5 or 701.8 claiming he was denied adequate mental health treatment or subjected to excessive force by Healy while he was confined at Upstate. [16] (Dkt. Nos. 46 at ¶ 87; 46–4 at ¶ 11 and 4.) Inasmuch as Plaintiff has failed to complete all of the steps of the DOCCS IGP with regard to his Eighth Amendment claim against Healy for deliberate indifference to his serious mental health needs and excessive force, he has failed to exhaust his administrative remedies. *See Woodford,* 548 U.S. at 90 (PLRA requires a plaintiff to complete all of the steps of the applicable IGP and to do so properly to exhaust administrative remedies).

**\*14** Plaintiff fairs no better under the three-part *Hemphill* inquiry. As to the first question, New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA." *Taylor v. Chalom,* No. 9:10 CV 1494 (NAM/DEP), 2011 WL 6942891, at \*4, 2011 U .S. Dist. LEXIS 150512, at \*12 (N.D.N.Y. Dec.13, 2011). That the grievance procedure was made available to, and actually used by, Plaintiff during his incarceration, is clear from his history of grievances revealed by Hale, and the grievance Plaintiff filed regarding his lost filling. (Dkt. Nos. 46–1 at ¶¶ 74, 82–85; 46–4 at 6–77; 49–2 at 4.)

Furthermore, there is no evidence in the record that Healy interfered in any way with efforts by Plaintiff to file a grievance against him under the IGP and, therefore, no basis for an estoppel. Third, the record is devoid of evidence of "special circumstances" excusing Plaintiff's failure to exhaust. To the contrary, Plaintiff has alleged in conclusory fashion in his Complaint that he did exhaust. *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (conclusory assertions are not enough to avoid summary judgment when the movant has set out a documentary case).

Therefore, the Court finds that Plaintiff has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims against Defendant Healy and recommends that Healy be granted summary judgment on that ground.

### 3. *Exhaustion as to Marinelli and Kemp*

In his Complaint, Plaintiff has alleged that he filed complaints regarding his claims against Marinelli and

Kemp with the OMH all the way up the chain to the OMH Commissioner. (Dkt. No. 1 at ¶ 65.) Although Plaintiff alleged that he also filed a grievance with Upstate, presumably under the IGP, and appealed the results to be sure exhaustion was complete, Hale's search of CORC records revealed no appeal by Plaintiff of a grievance complaining of his mental health treatment by Marinelli and Kemp. (Dkt. Nos. 1 at ¶ 65; 46–1 at ¶ 87; 46–4 at ¶ 11 and 4.) Therefore, the Court finds that Plaintiff did not exhaust his claims against Marinelli and Kemp under the IGP. See *Woodford,* 548 U.S. at 90.

That, however, does not end the Court's inquiry on the exhaustion because issues remain as to whether administrative remedies were in fact available to Plaintiff under the IGP with respect to his claims against Marinelli and Kemp [17] and whether there were special circumstances excusing exhaustion. *See Hemphill,* 380 F.3d at 686.

Plaintiff was questioned at his deposition [18] as to whether he filed a grievance against Marinelli:

> Q. Did you file any grievances against Mr. Marinelli (sic)?
>
> A. I think I did, yes.
>
> Q. Okay.
>
> A. I'm pretty sure I did. Or—because also, when you're dealing with M.H.U., you can't really grieve them. You have to write a complaint through—
>
> Q. To the medical—.
>
> A. —to the mental health department.
>
> Q. Right. Right. So the mental health issues go to mental health and the medical issues go to the medical director.
>
> **\*15** A. Go to medical, right.
>
> Q. Yes, okay.
>
> A. So even though you could write it, but its not going to get anywhere. So you have to they tell you

> Q. That's why you wrote to Kemp?
>
> A. Kemp, exactly.
>
> Q. Yup. Okay.
>
> A. That's the whole reason why, because you know, even they they're not even allowed to discuss your mental health file with the grievance people because of confidentiality. So that's kind of like a catch twenty-two.
>
> Q. So you complained to Kemp because, as you understood it, that's the proper process?
>
> A. Right.

(Dkt. No. 46–3 at 35–36.)

In determining whether administrative remedies are available to a particular inmate, a court should "be careful to look at the applicable set of grievance procedures, whether city, state, or federal." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (citation and internal quotation marks omitted). Administrative remedies are not available "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Booth v. Churner,* 532 U.S. 731, 736, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

Hale has described Plaintiff's Eighth Amendment claims against Marinelli and Kemp as the "proper subject for DOCCS grievance procedures as outlined under 7 NYCRR § 701.1 et seq." (Dkt. No. 46–4 at ¶ 9.) However, both Marinelli and Kemp are OMH, not DOCCS employees, and § 701.3(f) provides:

> (f) Outside agencies excluded.
>
> Any policy, regulation or rule of an outside agency (e.g., the division of parole, immigration and customs enforcement, the office of mental health, etc.) or action taken by an entity not under the supervision of the commissioner is not within the jurisdiction of the IGP.

7 NYCRR, § 701.3(f).

Grievances involving actions taken by OMH have in at least some instances been determined by DOCCS to be outside the jurisdiction of the DOCCS IGP based upon § 701.3(f). *See, e.g., Westmoreland v. Conway,* No. 07–

CV–104(Sr.), 2009 WL 2991817, at * 3–4, 2009 U.S. Dist. LEXIS 83993, at * 9–10 (W.D.N.Y. Sept.15, 2009) (plaintiff's allegation that his grievance was dismissed because the IGRC lacked authority over the OMH found to comport with 7 NYCRR § 701.3(f)); *Christian v. Goord,* No. 9:03–CV–901 (FJS/GJD), 2006 WL 1459805, at * 5, 2006 U.S. Dist. LEXIS 32143 (N.D.N.Y. May 22, 2006) (both the IGRC and Superintendent on appeal concluding that the OMH is outside the purview of DOCCS and the IGP).

Given the foregoing, the Court cannot conclude that administrative remedies under the IGP were available to Plaintiff with regard to his claims against OMH employees Marinelli and Kemp, or that Plaintiff's understanding that the IGP did not apply to OMH employees did not constitute a special circumstance excusing failure to exhaust, and recommends that Marinelli and Kemp be denied summary judgment on exhaustion grounds.

**B. Merits of Plaintiff's Eighth Amendment Claim Against Marinelli and Kemp**

**\*16** Defendants Marinelli and Kemp also seek summary judgment on the merits. Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). The requirement extends to adequate medical care. *See Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble,* [429 U.S. 97, 104 (1976) ], that it must be provided to prisoners."); *Guarneri v. Hazzard,* No. 9:06–CV–985 (NAM/DRH), 2010 WL 1064330, at 16, 2010 U.S. Dist. LEXIS 26966, at *52 (N.D.N.Y. Mar.22, 2010) (the denial of mental health care may constitute a violation of the Eighth Amendment).

To state a claim for denial of medical or mental health care, a prisoner must demonstrate (1) a serious medical (mental) condition, and (2) deliberate indifference. *Farmer,* 511 U.S. at 834–35; *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ("*Hathaway I*" ). The first

prong is an objective standard and considers whether the medical condition is sufficiently serious. *See Caiozzo v. Foreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). A "serious medical condition" has been described as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway I,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical or mental health condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

The second prong is a subjective standard. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)) ("*Hathaway II*" ). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway I,* 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; see also Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ( "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.")

**\*17** The record evidence does not support Plaintiffs claim that he suffered from a serious mental illness during his time at Upstate. [19] Furthermore, even though Plaintiff was deemed to have some degree of mental illness during at least a part of his time at Upstate, given the evidence of the mental health treatment Plaintiff received from OMH during his time there, no reasonable jury could find that either Marinelli or Kemp had been deliberately indifferent to Plaintiff's mental health issues and treatment needs. [20] *See Selevan v. N. Y. Thruway Auth.,* 711 F.3d 253, 256 (2d Cir.2013) (finding summary judgment appropriate where the nonmovant fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

Plaintiff arrived at Upstate with a diagnosis of ASPD, a prescription for Topamax, a Mental Health Level of 3, and a Transfer Progress note from Great Meadow stating his mental status was alert and oriented, with no evidence of a thought disorder, and a generally neutral and stable mood. (Dkt. Nos. 46–1 at ¶¶ 2–11; 47–1 at ¶¶ 5–16.) When Plaintiff was seen by Marinelli for a mental health assessment less than a week after his arrival at Upstate in September of 2009, Marinelli observed no mental health concerns or issues. (Dkt. Nos. 46–1 at ¶ 12; 48 at ¶ 12.)

Marinelli nonetheless placed Plaintiff on "active status" so he would continue to received OMH services and continued to see Plaintiff either cell-side or for a private therapy session on a regular basis until he was terminated from service on March 30, 2010, with Kemp's approval, after Plaintiff had denied the need for services and his Mental Health Level had been upgraded to a Level 6. (Dkt. Nos. 46–1 at ¶¶ 13–17, 19–36; 47–1 at 1; 48 at ¶¶ 30–33.) During that time, Plaintiff generally reported no mental health issues or concerns, and Marinelli reported that he observed no evidence of mental health issues. *Id.* Marinelli's notes are largely in accord with Dr. Wurzberger's positive assessment of Plaintiff's mental status on October 9, 2009, when he, not Marinelli or Kemp as Plaintiff claims, took Plaintiff off Topamax. (Dkt. Nos. 46–1 at ¶¶ 18–19, 43–44.)

Even after Plaintiff's OMH services were terminated, Marinelli continued to do SHU 90–day mental health evaluations, which confirmed that Plaintiff's Mental Health Level remained at Level 6 from March 30, 2010,

until his transfer to Clinton on November 15, 2010. (Dkt. No. 46–1 at ¶¶ 38–40; 47–1 at 1; 48 at ¶¶ 34–35, 37.)

While Plaintiff claims that Marinelli responded to his attempt at suicide by cutting his arms with a piece of metal by telling him it did not look too bad and to run water on the cuts (Dkt. No. 1 at ¶ 22), Marinelli denies the incident ever occurred, and there is no evidence of such an incident in Plaintiff's mental health records. (Dkt. Nos. 46–1 at ¶ 36; 48–1 at 1–118.) Even assuming, *arguendo,* that the incident did occur, Plaintiff has failed to present evidence that the cuts he inflicted were severe enough to cause serious injury or constitute what could reasonably have been construed by Marinelli as a serious attempt at suicide, and that Marinelli showed deliberate indifference.

**\*18** In light of the foregoing, the Court recommends that Defendants Marinelli and Kemp be granted summary judgment on the merits on Plaintiffs Eighth Amendment medical indifference claim.

### C. Eighth Amendment Claim Against Dyer
Plaintiff claims that Defendant Dyer, a corrections officer, showed deliberate indifference to his serious dental needs by preventing him from seeing the dentist for his lost filling on November 3, 2010. (Dkt. No. 1 at ¶¶ 55–58.) Although medical deliberate indifference claims are most-often asserted against medical personnel, non-medical personnel may also be held liable for deliberate indifference to medical needs, in this case dental needs, when a plaintiff proves that "prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Hodge v. Coughlin,* No. 92 Civ. 0622(LAP), 1994 WL 519902, at \* 11, 1994 U.S. Dist. LEXIS 13409, at \* 31 (S.D.N.Y. Sept.22, 1994) (citations and internal quotation marks omitted), *aff'd,* 52 F.3d 310 (2d Cir.1995) (table); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (same).

The record evidence shows that on November 3, 2010, Dyer was tasked with escorting Plaintiff to an ASAT evaluation and an appointment with the dentist to have his lost filling addressed. (Dkt. Nos. 1 at ¶ 55; 46–1 at ¶¶ 55–56; 51–2 at ¶¶ 22–23.) Dyer took Plaintiff to his ASAT evaluation while Plaintiff was waiting to see the dentist, and after the evaluation returned Plaintiff to the holding pen to wait to see the dentist. (Dkt. No. 46–1 at ¶¶ 58–

60; 51–2 at ¶¶ 10–11.) There is no evidence in the record indicating that Plaintiff would have seen the dentist any sooner had he not gone to the ASAT evaluation.

According to Dyer, while waiting to see the dentist, Plaintiff created a disturbance by yelling at the dental escort that he was going to be seen next by the dentist and was told to quiet down or he would be returned to his cell. (Dkt. Nos. 46–1 at ¶¶ 61–63; 51–2 at ¶¶ 12, 16.) At his deposition, Plaintiff admitted that he had started complaining and had called out to the dentist that he needed to see him. (Dkt. No. 46–3 at 53.) Dyer told Plaintiff to "stop causing a disturbance." (Dkt. Nos. 46–1 at ¶¶ 62–63; 51–2 at ¶ 13.)

Corrections Sergeant Santamore spoke to the dentist and was told there were priority cases ahead of Plaintiff. (Dkt. Nos. 46–1 at ¶ 64; 51–2 at ¶ 14.) Plaintiff continued to yell and create a disturbance, and Santamore ordered Dyer to take Plaintiff back to his cell. (Dkt. No. 46–1 at ¶¶ 65–66; 51–2 at ¶ 16.) Dyer followed the order and returned Plaintiff to his cell. (Dkt. No. 46–1 at ¶¶ 67–68; 51–2 at ¶¶ 17–19.)

Even if Dyer was aware that Plaintiff was "really in pain," as Plaintiff has alleged and Dyer has denied (Dkt. Nos. 1 at ¶ 55; 46–1 at 46–1 at ¶ 57; 51–2 at ¶ 8), there is no evidence in the record supporting Plaintiff's claim that Dyer intentionally delayed his access to dental care, or that Dyer was responsible for Plaintiff missing his dental appointment on November 3, 2010. Therefore, the Court recommends that Dyer be granted summary judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to his serious dental needs.

### D. Eighth Amendment Claim Against Miller

**\*19** Plaintiff claims that Dr. Miller was deliberately indifferent to his serious dental needs in violation of the Eighth Amendment by his failing to attend to a lost filling in a timely manner. (Dkt. Nos. 1 at ¶¶ 49, 76.) Plaintiff must, as with his claim for indifference to his serious mental health needs, show that he had a serious dental condition and that it was met with deliberate indifference from Miller. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *Chance,* 143 F.3d at 702. A serious medical, or in this case dental condition, exists where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain .' " *Chance,* 143 F.3d at 702 (citing

*Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). Specifically, "[a] cognizable claim regarding inadequate dental care ... can be based on various factors, such as the pain suffered by the plaintiff ... the deterioration of the teeth due to a lack of treatment ... or the inability to engage in normal activities." *Chance,* 143 F.3d at 703 (citations omitted); *see also Berry v. Wright,* No. 04–CV–0074(Sr.), 2011 WL 231626, at \*5, 2011 U.S. Dist LEXIS 6347, at \* 12–13 (W.D.N.Y. Jan.24, 2011) ("[a]lthough delay in providing a prisoner with dental treatment, standing alone, does not constitute an eighth amendment violation, ... a prisoner can state a claim of deliberate medical indifference under section 1983 if 'the delay was deliberate and that it caused him to suffer unnecessary and wanton infliction of pain.' ") (quoting *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir.1989)).

"When the basis of a prisoner's Eighth Amendment claim is a temporary delay ... in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." *Washington v. Farooki,* No. 9:11–CV–1137 (TJM), 2013 WL 3328240, at \*6, 2013 U.S. Dist. LEXIS 92623, at \*16 (N.D.N.Y. July 2, 2013) (quoting *Brunskill v. Cnty. of Suffolk,* No. 11–CV–586 (SJF)(ETB), 2012 WL 2921180, at \*3, 2012 U.S. Dist. LEXIS (E.D.N.Y. July 11, 2012)).

Dr. Miller has opined that "the loss of a filling without significant pain is not an emergent situation and does not require immediate dental treatment." (Dkt. Nos. 46–1 at ¶ 79; 49 at ¶ 23.) In this case, however, Plaintiff claims that the lost filling caused him a great deal of pain, left him unable to eat out of one side of his mouth, and prevented him from sleeping. (Dkt. Nos. 1 at ¶ 48; 27–1 at 31–32; 49–2 at 4.) There is no evidence to the contrary in the summary judgment record. Plaintiff lost the filling on August 29, 2010, was not scheduled to have the lost filling addressed by the dentist until November 3, 2010, more than two months later, and ultimately did not have the lost filling taken care of until shortly after he was transferred to Clinton on November 15, 2010. (Dkt. Nos. 1 at ¶¶ 48, 63; 46–1 at ¶¶ 54, 72.) Even assuming without deciding that the great pain and problems with eating and sleeping Plaintiff claims resulted from the lost filling, when considered with the delay in treatment, constituted a serious dental condition, Dr. Miller is entitled to summary

judgment because the record evidence does not show deliberate indifference on his part. *See Hunt,* 865 F.2d at 200 (deliberate indifference where the delay was deliberate and caused plaintiff to suffer unnecessary and wanton infliction of pain).

**\*20** The note in Plaintiff's dental records from his September 29, 2010, cleaning, which Miller acknowledged seeing noted only that Plaintiff had complained of a lost filling and said nothing about being in pain as a result. (Dkt. Nos. 46–1 at ¶ 51; 49–1 at 3.) Because in Miller's opinion, absent a report of significant pain, the lost filling was not emergent (Dkt. Nos. 46–1 at 79; 49 at ¶ 23), failure to schedule an appointment to fix the tooth until November 3, 2010, does not show culpable recklessness on his part. *See Hathaway II,* 99 F.3d at 553.

While Plaintiff claims to have submitted a number of sick call slips to the Dental Department requesting assistance, Miller investigated Plaintiff's chart in response to an October 5, 2010, grievance filed by Plaintiff and determined that no call-out slips from Plaintiff had been received by the Dental Department during the relevant time period. (Dkt. Nos. 46–1 at ¶ 75; 49 at ¶ 19.) Moreover, while Plaintiff also claims to have sent letters of September 6 and September 14, 2010, to Miller advising him of his great pain and requesting assistance regarding the lost filling (Dkt. Nos. 1 at ¶¶ 49; 27–1 at 31–32), Dr. Miller has stated in his Declaration that he was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that he ignored. (Dkt. Nos. 46–1 at ¶ 80; 49 at ¶ 24.) There is no evidence in the record refuting that statement, no evidence that Dr. Miller ever saw the dental slips Plaintiff claims to have submitted or the letters Plaintiff claims to have sent to him. Given Plaintiff's failure to respond to Defendants' L.R. 7.1 Statement of Material Facts, he is deemed to have admitted that Miller's investigation revealed no call-out slips regarding Plaintiff's lost filling, and Miller was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that was ignored. (Dkt. Nos. 46–1 at ¶¶ 75, 80; 49 at ¶¶ 19, 24.)

Finally, the evidence shows that an appointment was scheduled for November 3, 2010, for Plaintiff's lost filling to be addressed, and Miller had no part in Plaintiff being returned to his cell before seeing him, or in the execution of the Refusal of Medical Examination and/or Treatment form. (Dkt. Nos. 46–1 at ¶¶ 67, 72; 49 at ¶ 16; 51–2 at ¶ 17.) Plaintiff was transferred to Clinton shortly thereafter

where his tooth was fixed. (Dkt. No. 46–1 at ¶ 73; 49 at ¶ 17.)

In light of the foregoing, the Court recommends that Miller be granted summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim against him.

### E. Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity. (Dkt. No. 46–2 at 15–18.) Inasmuch as the Court is recommending that Defendants be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

### F. John Doe Defendants # 1–6

**\*21** Plaintiff has asserted claims against John Doe Defendants # 1–6 in this action. There is nothing in the record showing that any of the John Doe Defendants have been identified and served in this lawsuit which was commenced nearly three years ago. (Dkt. No. 1.) The discovery completion deadline in the case was January 18, 2014, more than a year ago. (Dkt. No. 32.) The Court finds that Plaintiff has had ample time and opportunity to discover the identity of the John Doe Defendants and serve them. Given Plaintiff's failure to do so, the Court recommends the *sua sponte* dismissal of John Doe # 1–6 from the action for failure to prosecute. *See Delrosario v. City of N.Y,* No. 07 Civ.2027(RJS), 2010 WL 882990, at \* 5, 2010 U.S. Dist. LEXIS 20923, at \* 12 (S.D.N.Y. Mar.4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants ."); *Coward v. Town & Vill. of Harrison,* 665 F.Supp.2d 281, 301 (S.D.N.Y.2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.") (citation and internal quotation marks and punctuation omitted).

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 46) be **GRANTED IN ITS ENTIRETY;** and it is further

RECOMMENDED that Plaintiff's claims against John Doe Defendants # 1–6 be DISMISSED WITHOUT PREJUDICE from this action due to Plaintiff's failure to prosecute; and it is hereby

ORDERED, that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision m *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Dated: January 30, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 791547

Footnotes

1    Although with the exception of the claims dismissed on Eleventh Amendment grounds, Plaintiff was granted leave to amend, no amended complaint has been filed.

2    References to page numbers in citations to documents filed with the Clerk refer to the page numbers assigned by the Court's electronic filing system.

3    Plaintiff will be provided with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2008) (per curiam).

4    N.D.N.Y. L.R. ("L.R.") 7.1(b)(3) provides that '[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."

5    Plaintiff's Complaint in this case was properly verified under 28 U.S.C. § 1746. (Dkt. No. 1 at 17–18.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

6    *See also Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030–31 (9th Cir.2001) (holding it unfair to the district court, other litigants, and the movant to impose a duty on the district court to "search and sift the factual record for the benefit of a defaulting party.")

7    The Second Circuit has recognized that district courts "have the authority to institute local rules governing summary judgment submissions, and have affirmed summary judgment rulings that enforce such rules. Rules governing summary judgment practice are essential tools for district courts permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of hunting through voluminous records without guidance from the parties ." *N.Y. State Teamsters Confer, Pension and Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 647 (2d Cir.2005) (citation and internal punctuation and quotation marks omitted).

L.R. 7.1(a)(3) provides that on a summary judgment motion movants submit a "Statement of Material Facts" setting forth in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue. Each fact shall set forth a specific citation to the record where the fact is established .... The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment .... The opposing party shall file a response to the Statement of Material Facts .... *The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."*

8    *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) ("[I]n determining whether the moving party has met its burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

9    Defendants have complied with L.R. 7.1(a)(3) and L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 46.)

10    Where a fact has been included in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46–1), docket references are made herein to both the Statement and the record evidence cited in support of the fact.

11   According to Marinelli, PIMS stands for "Progressive Inmate Movement System," established for the standardization of a system of progressive advancements for SHU inmates based upon behavioral adjustment. (Dkt. No. 48 at ¶ 20 n. 3.)

12   Defendant Healy seeks summary judgment solely on failure to exhaust grounds and has submitted no factual evidence with regard to Plaintiff's Eighth Amendment claim against him. (*see* Dkt. No. 46–1 at ¶¶ 82–86, 88.) The background facts included herein are from Plaintiff's verified Complaint.

13   Copies of the letters, which were identified as exhibits in the Complaint were submitted by Plaintiff in opposition to Defendants' earlier motion to dismiss and are considered herein as a part of Plaintiff s Complaint. (Dkt. Nos. 1 at ¶ 49; 27–1 at 31–32.)

14   In its denial of Plaintiff's grievance, the Internal Grievance Resolution Committee wrote "Grievant should write to the Dental Dept. and address his concerns and to be scheduled. writing to the IGRC isn't the proper procedure to obtain an appt." (Dkt. No. 49–2 at 3.) The Committee appears to have made no reference to the September 6 and 14, 2010, letters Plaintiff claims to have sent to Miller. *Id.;* Dkt No. 27–1 at 31–32.

15   Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

16   Defendants have submitted the grievance files on the grievances listed as having been appealed to CORC by Plaintiff (Dkt. No. 46–4 at 4) so that the Court has been able to ascertain that none of them involved Plaintiff's claims against Healy. *Id.* at 8–77.

17   As noted above, Defendants have the burden of showing that the administrative remedy was actually "available" to Plaintiff. *See Murray,* 2010 WL 1235591, at *4.

18   Defendants submitted Plaintiff's deposition transcript in support of their summary judgment motion. (Dkt. No. 46–3.)

19   Plaintiff's letters to Kemp and Hogan regarding his mental health problems and alleged lack of proper care, with the exception of his complaints about Marinelli's reaction to his alleged suicide attempt discussed below, were far too general and conclusory to create an issue of material fact as to the seriousness of his mental health issues in light of the mental health records submitted by Defendants. (Dkt. No. 27–1 at 5–13.)

20   A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correc. Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207 (2d Cir.1986).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jason A. KETCHUCK, Plaintiff,
v.
Brad A. BOYER, Defendant.
No. 3:10–CV–870 (TJM / DEP).

Oct. 25, 2011.
Jason A. Ketchuck, Endicott, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

*1 Plaintiff Jason A. Ketchuck commenced this action *pro se* asserting claims of false arrest, malicious prosecution, and abuse of process pursuant to 42 U.S.C. § 1983. *See* Compl., dkt. # 1. Defendant moves for summary judgment seeking to dismiss the action in its entirety. *See* Motion, dkt. # 15. In opposition, Plaintiff filed only affidavits from himself and his father. *See* Opp., dkt. # 18.[FN1] Defendant has filed a reply. *See* Reply, dkt. # 19. The Court has determined to decide the motion based upon the submissions alone. *See* N.D.N.Y.L.R. 7.1(h) ("In the district court judge's discretion ..., the district court judge may dispose of a motion without oral argument. Thus, the parties should be prepared to have their motion papers serve as the sole method of argument on the motion.").

> FN1. Plaintiff was served with the Northern District's standard summary judgment notification for *pro se* litigants, *see* dkt. # 15–1. This notification provided, *inter alia,*
>
> Pursuant to Local Rule 7.1 of the Northern District of New York, you are required to submit the following papers in opposition to this motion: (I) a memorandum of law (containing relevant factual and legal argument); (ii) one or more affidavits in opposition to the motion and (iii) a short and concise statement of material facts as to which you claim there are genuine issues in dispute. These papers must be filed and served in accordance with the time set by Local Rule 7.1.
>
> If you do not submit a short and concise statement of material facts as to which you claim there are genuine issues in dispute, all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted.

**II. STANDARD OF REVIEW**

The Court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must show, by affidavits or other evidence, admissible in form, that there are specific factual

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." *Viscusi v. Proctor & Gamble,* 2007 WL 2071546, at * 9 (E.D.N.Y. July 16, 2007).

In determining whether to grant summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita.,* 475 U.S. at 586, or by a factual argument based on "conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

**\*2** The Local Rules of the Northern District require a party moving for summary judgment to submit a "Statement of Material Facts" which sets forth, with citations to the record, each material fact about which the moving party contends there exists no genuine issue. N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement is submitted, the party opposing the motion must

> file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

*Id.* (underscoring in original).

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a) (3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F.Supp.2d 104, 108 (N.D.N.Y.2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations—specific or otherwise—to the record") (emphasis in original); *McKnight v. Dormitory Auth. of State of N.Y.,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) (McAvoy, J.) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F.Supp.4 311, 317 (N.D.N.Y.1999) (McAvoy, J.) (deeming admitted all facts in defendants' Rule 7.1(a) (3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

While the Court must construe a *pro se* litigant's pleadings and papers liberally and interpret them to raise the strongest arguments that they suggest, *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003);[FN2] *Veloz v. New York,* 339 F.Supp.2d 505, 513 (S.D.N.Y.2004), the application of this lenient standard does not relieve a *pro se* litigant of the requirement to follow the procedural formalities of Local Rule 7.1(a)(3).

*Govan,* 289 F.Supp.2d at 295; *see also Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS,* 59 F.3d 5, 8 (2nd Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

generally are required to inform themselves regarding procedural rules and to comply with them.").

> FN2. To construe pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan, 289 F.Supp.2d at 295*.

## III. BACKGROUND

**\*3** Because Plaintiff has not submitted an opposing Statement of Material Facts, the properly supported facts set forth in Defendant's Statement of Material Facts are deemed admitted for purposes of this motion. N.D.N.Y.L.R. 7.1(a)(3). Except where indicated otherwise, the following facts are taken from Defendant's Statement of Material Facts.

Defendant Brad A. Boyer is a uniformed New York State Trooper assigned to the Owego Barracks of Troop C of the New York State Police, headquartered in Sidney, New York. On October 22, 2008, he responded to a call from an individual named Carol A Smith who complained that Plaintiff Jason Ketchuck, one of the sons of her next door neighbor, had repeatedly driven his vehicle through her yard, and that the most recent occasion on which this had occurred was at approximately 7:38 AM on October 22, 2008. She complained that this course of conduct had caused rutting and damage to her front lawn.

Upon responding to the call, Trooper Boyer observed the rutting and damage to Ms. Smith's lawn alongside the roadway in front of her house, and took a series of photographs of the lawn. Trooper Boyer took a sworn statement from Ms. Smith on October 22, 2008, and she signed a Complaint against Jason A. Ketchuck on the same date accusing him of Trespass, in violation of *New York Penal Law § 140.05*. Based upon the information provided by Ms. Smith and the property damage that he observed and photographed on October 22, 2008, Trooper Boyer also prepared and signed an Information charging Jason A. Ketchuck with Criminal Mischief in the Fourth Degree.

On October 31, 2008, Trooper Boyer requested that Plaintiff come to the Owego Barracks to meet with him

concerning Ms. Smith's complaint, which he did. Mr. Ketchuck admitted that he had been the driver of the small grey car on the date and time that had been the subject of Ms. Smith's complaint; however, he denied that he had driven the car on her lawn. Mr. Ketchuck also contended that the ruts near the road were on property that was abandoned by the Town of Owego in 1934 and that, although Ms. Smith "extended the landscaping of her property onto the abandoned road without the Town's permission" seven (7)years prior, his father was claiming ownership of this property in a quite title action in New York State Supreme Court. Jason Ketchuck Aff., ¶ 9; *see* James Ketchuck Aff., ¶¶ 2, 8. Ketchuck's father also contends that, prior to charges being levied against his son, he met with Trooper Boyer and attempted to show Trooper Boyer "property maps, surveys, deeds, and town records which set forth the property lines and boundaries of the property owned by [Ms.] Smith," but Trooper Boyer "refused to look at them." James Ketchuck Aff., ¶¶ 6–7.

Trooper Boyer issued Plaintiff an appearance ticket charging him with Trespass in violation of *Penal Law § 140.05* and Criminal Mischief in the Fourth Degree in violation of Penal Law § 145. After issuing the appearance ticket to Jason A. Ketchuck on October 31, 2008, Trooper Boyer did not have any further involvement in the prosecution of this case. The charges were Dismissed in the Interest of Justice in the Owego Town Court on May 27, 2009.

## IV. DISCUSSION

### a. False Arrest

**\*4** Plaintiff claims that he was falsely arrested by Defendant. A false arrest claim, whether brought under federal or state law,[FN3] will fail if, at the time of the seizure, the arresting officer had probable cause to make an arrest. *Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir.2003); Smith v. Edwards, 175 F.3d 99, 105 (2d Cir.1999); Weyant v. Okst, 101 F.3d 845, 852 (2d Cir.1996); see Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir.2006)* ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 593, 160 L.Ed.2d 537 (2004) (citing *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)).

> FN3. Plaintiff asserts claims only under federal law pursuant to 42 U.S.C. § 1983. However, given Plaintiff's *pro se* status, the Court examines the potential supplemental state law claims that might be asserted.

"Probable cause exists if at the time of the arrest 'the facts and circumstances within th[e officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Amore v. Novarro,* 624 F.3d 522, 536 (2d Cir.2010 (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *see Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999). The relevant inquiry is whether "probable cause existed to arrest a defendant" and "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly,* 439 F.3d at 154; *see Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (probable cause to arrest can exist even if offense relied upon is not even "closely related" to offense charged). "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego,* 820 F.Supp. 54, 55 (N.D.N.Y.1993), *aff'd,* 52 F.3d 310 (2d Cir.1995). "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Hahn,* 820 F.Supp. at 55 (citing *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)).

"It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (quoting *Miroslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd* 993 F.2d 1534 (2d Cir.1993)). "If policemen arrest a person on the basis

of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable ... merely because it later turns out that the complaint was unfounded." *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997); *see Calderola v. Calabrese,* 298 F.3d 156, 165 (2d Cir.2002) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be the case."). Once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997); *see Coons v. Casabella,* 284 F.3d 437, 441 (2d Cir.2002) ("[P]olice officers are not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Hotaling v. LaPlante,* 67 F.Supp.2d 517, 522 (N.D.N.Y.2001) (valid probable cause to arrest rested upon information supplied by an identified witness, and even though a further investigation by the Trooper would have led to a contradictory conclusion, Trooper's conduct was not unreasonable under the circumstances).

**\*5** Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the Court as a matter of law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Even where factual disputes exist, a § 1983 claim may fail if the plaintiff's version of events is sufficient to establish probable cause to arrest. *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 133 (E.D.N.Y.1998).

Here, the alleged victim provided Defendant with a sworn statement that Plaintiff repeatedly drove his vehicle over a portion of her lawn causing damage to it. The victim's statement was corroborated by the tire marks and the ruts in the lawn which Defendant observed and photographed; and by Plaintiff's admission that he was the driver of the car alleged to have caused damage to the lawn. These facts provided more than ample probable cause for Defendant to believe that Plaintiff committed the offense of Trespass under Section 140.05 of the New York Penal Law.[FN4] In this regard, the facts provided probable cause to believe that Plaintiff had intentionally driven his car across Ms. Smith's lawn on October 22, 2008; that she

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

did not consent to his doing so; and that Plaintiff's conduct on his neighbor's property, which had caused observable damage to the lawn, was not conduct that Plaintiff was licensed or privileged to engage in. *See Caidor v. Harrington,* 2009 WL 174958 (N.D.N.Y.2009) (Suddaby, J.) (granting summary judgment dismissing § 1983 false arrest claim based on arrest for violation of P.L. § 140.05). Moreover, these same facts provided ample probable cause to believe that Plaintiff had committed the offense of Criminal Mischief in the Fourth Degree in violation of N.Y. Penal Law § 145 [FN5] in that the facts, including the allegation that Plaintiff's car was repeatedly driven on the lawn, provided probable cause to believe that Plaintiff intentionally damaged Ms. Smith's property by driving his car on it.

> FN4. Section 140.05 of New York Penal Law provides that "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises. Trespass is a violation." "Premises" is defined to include any "building" or "real property." Penal Law 140.00(1). Penal Law § 140.00(5) provides that a person "enters or remain(s) unlawfully upon premises when he is not licensed or privileged to do so."

> FN5. In relevant part, Penal Law § 145 provides:

> A person is guilty of criminal mischief in the fourth degree when, having no right to do so nor any reasonable ground to believe that he or she has such right, he or she:

> 1. Intentionally damages property of another person[.]

> "While no statutory definition of 'damages' is provided, it is commonly recognized that the term contemplates 'injury or harm to property that lowers its value or involves loss of efficiency' and that only 'slight' damage must be proved" to establish a violation of Penal Law § 145. *People v. Collins,* 288 A.D.2d 756, 758, 733 N.Y.S.2d 289 (3d Dept.2001).

Because a police officer need not explore every

theoretically plausible claim of innocence before making an arrest, and because the existence of probable cause is determined by a standard far less burdensome than determining guilt, Defendant's probable cause determination is not negatively affected by Plaintiff's assertion of innocence or by Defendant's failure to review the property maps or surveys. [FN6] A police officer is not required to conduct an investigation if the facts demonstrate that probable cause exists that an offense has been committed. Accordingly, Defendant was not required to conduct independent research into who actually owned the property claimed by Ms. Smith as her front lawn before issuing the appearance ticket. This is especially so in light of the undisputed facts that the tire marks were on property abutting Ms. Smith's front lawn and on a piece of property over which Ms. Smith purportedly "extended the landscaping of her property" some seven (7) years prior to the incident. These facts provided reasonable corroboration for Ms. Smith's sworn statement that the tire marks and ruts were on her property.

> FN6. Defendant denies that the purported property dispute regarding the subject portion of Ms. Smith's front yard was ever articulated to him. Regardless, even if a property dispute regarding the subject property was articulated to Defendant, he was not required to a perform a title search or make additional inquiry to resolve the dispute in light of the sworn statement by Ms. Smith that the property in question belonged to her.

**\*6** Even assuming, *arguendo,* that actual probable cause did not exist to satisfy the demands of the Fourth Amendment, arguable probable cause existed such to entitle Defendant to qualified immunity. *See Zellner v. Summerlin,* 494 F.3d 344, 369–70 (2d Cir.2007) (discussing "arguable probable cause" as basis for qualified immunity). Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Amore,* 624 F.3d at 536 (citing *Walczyk v. Rio,* 496 F.3d 139, 163 (2d Cir.2007)). To determine whether an officer had arguable probable cause, the objective information he possessed at the time

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

of the arrest is examined, not the "subjective intent, motives or beliefs" of the officer. *Id.* Here, the information Defendant possessed at the time he issued the appearance ticket provided an objectively reasonable basis for him to believe that probable cause existed for the two offenses with which Plaintiff was charged. Accordingly, Defendant is entitled to qualified immunity on the false arrest claim because it was objectively reasonable for him to believe that his acts did not violate Plaintiff's clearly established rights under the Fourth Amendment. *Id.* at 530 ( [Q]ualified immunity ... is sufficient to shield executive employees from civil liability under § 1983 if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights."). For these reasons, the false arrest claim is dismissed.

**b. Malicious Prosecution**

Based on the undisputed facts that supplied Defendant with actual probable cause to believe that Plaintiff committed the two offenses for which he was charged, the malicious prosecution claim also fails as a matter of law. *See Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000) (an element of a malicious prosecution claim is that the defendant lacked probable cause to believe the proceeding could succeed).

Moreover, to state a claim for malicious prosecution under either § 1983 or New York state common law, Plaintiff must establish, *inter alia,* "termination of the proceeding in [the accused's] favor." *Green v. Mattingly,* 585 F.3d 97, 104 (2d Cir.2009). Whether termination is deemed favorable to the accused is determined in accordance with applicable state law, here, New York law. *Hygh v. Jacobs,* 961 F.2d 359, 367 (2d Cir.1992). Proceedings are "terminated in favor of the accused" when their final disposition is such as to indicate the accused is not guilty. *DiBlasio v. City of New York,* 102 F.3d 654, 657 (2d Cir.1996). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton v. Robinson,* 289 F.3d 188, 196 (2d Cir.2002). A dismissal "in the interest of justice" under New York Criminal Procedure Law § 170.40 "cannot provide the favorable termination required

as the basis for a claim of malicious prosecution." *Hygh,* 961 F.2d at 368 (citing *Ryan v. N.Y. Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 493 (1984)). Thus, Plaintiff cannot establish the "favorable termination" element of his malicious prosecution claim.

**\*7** Further, the undisputed facts are that Trooper Boyer never had any prior contact with either Mr. Ketchuck or Ms. Smith before this incident. He attested that he harbored no improper motive in instituting the charges, and that he issued the appearance ticket and filed the accusatory instruments in the Town Court only because of his good faith belief that there was the probable cause to pursue such charges. *See* Boyer Aff. ¶¶ 11, 13. There are no facts from which a reasonable fact finder could conclude that Trooper Boyer instituted the underlying proceeding with a malicious motive or intent such to state a viable malicious prosecution claim. *See Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir.2010) (to prevail on a malicious prosecution claim, a plaintiff must establish, *inter alia,* that the proceeding was begun with malice); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) (malice may be proven by showing that the prosecutor had "a wrong or improper motive, something other than a desire to see the ends of justice served") (internal quotation marks omitted).

Finally, for the reason discussed above with regard to Trooper Boyer's entitlement to qualified immunity on the false arrest charge, he is also entitled to qualified immunity on the malicious prosecution claim. That is, under the circumstances it was objectively reasonable for reasonable officers to believe that there was probable cause to commence the prosecution for the offenses charged. Accordingly, the malicious prosecution claim is dismissed.

**c. Abuse of Process**

Plaintiff's third claim against Trooper Boyer is for malicious abuse of process in connection with the institution of the Town Court proceeding. "In the criminal context, malicious abuse of process is by definition a denial of procedural due process.... Procedural due process forbids the use of legal process for a wrongful purpose." *Abreu v. Romero,* 2010 WL 4615879, at \*8

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

(S.D.N.Y. Nov.9, 2010) (citation omitted). To state a claim for the malicious abuse of process, Plaintiff must prove that the Defendant (1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003). "The pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." *Lopez v. City of New York,* 901 F.Supp. 684, 691 (S.D.N.Y.1995) (citing PSI *Metals v. Firemen's Ins. Co.,* 839 F.2d 42, 43 (2d Cir.1988)). In other words, Plaintiff "must claim that [Defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino,* 331 F.3d at 77. "In New York, such wrongful purposes have included economic harm, extortion, blackmail, and retribution." *Abreu,* 2010 WL 4615879, at *8 (citing *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 404, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975)).

*8 Plaintiff's malicious abuse of process claim fails as the facts are devoid of any allegations concerning any "collateral objective" that Defendants may have had in instituting criminal charges against Plaintiff. There is no factual basis upon which a reasonable fact finder could conclude that the issuance of the appearance tickets to Plaintiff was motivated by anything other than Trooper Boyer's good-faith belief that he had probable cause to conclude that Plaintiff had engaged in conduct that constituted trespass and/or criminal mischief. Furthermore, there is no evidence that Trooper Boyer had any involvement in the prosecution of the case against Plaintiff after he issued the appearance tickets on October 31, 2008. Under these uncontested facts, the claim fails as a matter of law.

Finally, and assuming *arguendo* that a viable malicious prosecution claim existed, Trooper Boyer is entitled to qualified immunity on the claim in that there existed, at the least, arguable probable cause to commence the criminal proceeding. This arguable probable cause provides an objectively reasonable justification for issuing process commencing the underlying proceeding. *Cf. Abreu,* 2010 WL 4615879, at *8 ("While probable cause

is not an element of an abuse of process claim, under New York law, a showing of probable cause at the time process issued suffices ... to establish excuse or justification for the purposes of a defense to abuse of process.") (internal quotation marks and citation omitted). Accordingly, the abuse of process claim is dismissed.

**V. CONCLUSION**

For the reasons discussed above, Defendant's motion for summary judgment [dkt. # 15] is **GRANTED** and all claims in this case are **DISMISSED.**

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Ketchuck v. Boyer
Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.